# UNITED STATES DISTRICT COURT

| | |
|---|---|
| PAUL KAMIENSKI, et al.<br><br>*Plaintiff,*<br><br>v.<br><br>MARLENE LYNCH FORD, THOMAS F. KELAHER, JAMES W. HOLZAPFEL, RONALD F. DELIGNY, SAMUEL J. MARZARELLA, E. DAVID MILLARD, JAMES A. CHURCHILL, and DANIEL T. MAHONY.<br><br>*Defendants.* | Civil Action No.: 3:11-cv-03056 (PGS)(DEA)<br><br>MEMORANDUM AND ORDER |

SHERIDAN, U.S.D.J.

This matter comes before the Court on a motion for summary judgment by Defendants Marlene Lynch Ford, Thomas F. Kelaher, James W. Holzapfel, Ronald F. DeLigny, John Mercun, Samuel J. Marzarella, E. David Millard, James A. Churchill, and Daniel T. Mahony (hereinafter "Defendants") (ECF No. 155); and a motion to supplement the record brought by Plaintiff (ECF No. 224). The case arises from an alleged wrongful prosecution and incarceration of Plaintiff, Paul Kamienski, for the murders of Henry (Nick) and Barbara DeTournay committed on September 19, 1983. The history of this case has previously been set out in a number of issued opinions by several courts, and the Court incorporates herein the facts and procedural history as set forth in those opinions. *See, Kamienski v. Hendricks*, 332 F. App'x 740, 744 (3d Cir. 2009)[1].

The motion for summary judgment was filed more than two years ago, and the delay in deciding it is due to supplemental briefing and updating the record. More specifically, at the time

---

[1] Note: The reader should read this cited opinion initially because this Memorandum focuses on trial issues raised by the parties.

of filing, the Defendants moved for summary judgment primarily based upon prosecutorial immunity and qualified immunity for each defendant. In response, Plaintiff set forth sixteen specific allegations of acts or omissions concerning the investigation and prosecution of Kamienski which he argues constituted a breach of his constitutional rights. Upon review of the original filing, Defendants did not address each of the sixteen acts or omissions. As a result, the Court requested that each of these sixteen allegations be addressed in supplemental briefing.

For organizational purposes, a summary of the applicable law is set forth initially, followed by the identification of each Defendant to understand his or her role in the prosecution of Kamienski, then a separate section on each of the sixteen allegations with corresponding facts and legal analysis.

I.

Summary judgment is appropriate under Fed. R. Civ. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fidelity Bancorp*, 912 F.2d 654, 657 (3d Cir. 1990); *see also* Fed. R. Civ. P. 56(e) (requiring nonmoving party to set forth specific facts showing that there is a genuine issue for trial). Moreover, only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *Anderson*, 477 U.S. at 247-48. If a court determines, after drawing all inferences in favor of the non-moving party, and making all credibility determinations in his favor "that no reasonable jury could find for him, summary judgment is appropriate." *Alevras v. Tacopina*, 226 Fed. App'x. 222, 227 (3d Cir. 2007).

## II.

As noted, this case revolves around the alleged deprivation of civil rights in the investigation and prosecution of Kamienski. Section 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress.

42 U.S.C. § 1983. "By its own terms, the statute does not create substantive rights. Instead, it only provides remedies for deprivations of rights established elsewhere in the Constitution or federal

laws." *Williams v. Consovoy*, 333 F. Supp. 2d 297, 299 (D.N.J. 2004) (quoting *Brown v. Pa. Dep't of Health Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 477 (3d Cir. 2003)). To establish a § 1983 claim, a plaintiff must establish: (1) conduct by a "person"; (2) who acted "under the color of state law"; (3) proximately causing; and (4) a deprivation of a federally protected right. *See* Section 1983, Federal Judicial Center, at 133 (Third Ed. 2014); *see also West v. Atkins*, 487 U.S. 42, 48 (1988).

The Fourteenth Amendment to the United States Constitution states "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1. "The touchstone of due process is protection of the individual against arbitrary action of government . . . ." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845, 118 S. Ct. 1708, 1716 (1998). Thus, to establish a substantive due process claim under §1983, a plaintiff must prove that: (1) the particular interest at issue is protected by the Fourteenth Amendment, and (2) the government's deprivation of that protected interest shocks the conscience. *Connection Training Servs. v. City of Phila.*, 358 Fed. App'x 315, 319 (3d Cir. 2009).

Generally, to show such deprivation of a Fourteenth Amendment due process right "requires the Plaintiff to establish that a state [actor] . . . intentionally or deliberately caused the deprivation of" the right. Section 1983 Litigation, Federal Judicial Center, at 12-13 (3d Edition 2014). "The Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property." *Daniels v. Williams*, 474 U.S. 327, 328 (1986) (emphasis in original).

Through sixteen allegations, Kamienski alleges that Defendants violated his Fourteenth Amendment right to due process by: (1) not conducting a full and fair investigation; (2) failing to provide exculpatory evidence; (3) creating false or misleading statements; (4) coercing witnesses

4

to give false testimony; (5) presenting false or misleading evidence to the jury; (6) filing false and misleading briefs with the Court; and (7) failing to supervise the investigation, prosecution, and post-conviction litigation. (*See* ECF No. 186, at 17, 19, 20, 22, 24, 26, 27, 28, 29, 30, 31, 32, 33, 34). In response, Defendants argue that none of these allegations amount to a violation of due process, and at most, "Kamienski's criticisms consist of second guessing as to additional areas of investigation which could have been conducted. Lacking any evidence of intentional or bad faith acts, Kamienski essentially accuses the OCPO [Ocean County Prosecutors Office] Defendants of negligence." (Def. Supp. Br., ECF No. 194, at 13-14). Defendants also assert qualified immunity and absolute prosecutorial immunity apply to their actions. Both prosecutorial and qualified immunity are explained below.

III.

Prosecutorial immunity applies when a prosecutor advocates for the state by engaging in conduct that is "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976). "A prosecutor bears the 'heavy burden' of establishing entitlement to absolute immunity." *Odd v. Malone*, 538 F.3d 202, 207-08 (3d Cir. 2008). The presumption is that qualified immunity, rather than absolute immunity, "is sufficient to protect government officials in the exercise of their duties." *Burns v. Reed,* 500 U.S. 478, 486-87, 111 S. Ct. 1934, 1939 (1991). In order to overcome this presumption, a "prosecutor must show that he or she was functioning as the state's advocate when performing the action(s) in question." *Odd*, 538 F.3d. at 208 (citing *Yarris v. Cnty. of Del.*, 465 F.3d 129, 136 (2006)). Thus, courts evaluate whether a prosecutor may assert absolute immunity by engaging in a "functional analysis" of the prosecutor's actions. *Giuffre v. Bissell*, 31 F.3d 1241, 1251 (3d Cir. 1994). The functional analysis looks to the nature of the function performed, not the actor who performed the function. *Buckley*

*v. Fitzsimmons*, 509 U.S. 259, 269 (1993). Moreover, the functional analysis "focuses on the conduct . . . not on the. harm the conduct may have caused or the question whether it was lawful." *Id.* at 271.

Essentially, "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his [or her] role as an advocate for the State, are entitled to the protection of absolute immunity." *Buckley*, 509 U.S. at 273. "This includes activity taken while in court, such as the presentation of evidence or legal argument, as well as selected out-of-court behavior intimately associated with the judicial phases" of litigation. *Kulwicki v. Dawson*, 969 F.2d 1454, 1463 (3d Cir. 1992). The Supreme Court considers the following factors in deciding whether to extend absolute immunity under § 1983: whether "(1) there is a common law tradition of according immunity in similar situations; (2) denying immunity would subject the prosecutor to the chilling influence of vexatious lawsuits; and (3) there exist adequate checks on prosecutorial abuse other than individual suits against the prosecutor." *Odd*, 538 F.3d at 216 (first citing *Imbler,* 424 U.S. at 421-29; then citing *Burns,* 500 U.S. at 492-96; then citing *Kulwicki,* 969 F.2d at 1463).

However, "the actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor." *Buckley*, 509 U.S. at 273. Instead, prosecutorial immunity does not apply to "[a] prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings. " *Id.* at 273 (1993) (citing *Burns*, 500 U.S. at 494-96). "The key is whether or not a prosecutor is functioning in 'his role as advocate for the State' when undertaking the actions in question. If the answer to this question is yes, then absolute immunity applies. If not, then the prosecutor is entitled to only qualified immunity, 'the norm for executive officers[.]'" *Murphy v. Middlesex Cnty.*, No.

6

15-7102, 2017 U.S. Dist. LEXIS 56663, at *18-19 (D.N.J. Apr. 13, 2017) (quoting *Buckley*, 509

U.S. at 273). "To be sure, this immunity does leave the genuinely wronged defendant without civil

redress against a prosecutor whose malicious or dishonest action deprives him of liberty." *Imbler*,

424 U.S. at 427.

The Supreme Court has explained that when a prosecutor performs the investigative

functions normally performed by a detective or police officer,

> [t]here is a difference between the advocate's role in evaluating evidence and
> interviewing witnesses as he prepares for trial, on the one hand, and the detective's
> role in searching for the clues and corroboration that might give him probable cause
> to recommend that a suspect be arrested, on the other hand. When a prosecutor
> performs the investigative functions normally performed by a detective or police
> officer, it is "neither appropriate nor justifiable that, for the same act, immunity
> should protect the one and not the other." *Hampton* v. *Chicago*, 484 F.2d 602, 608
> (7th Cir.) (internal quotation marks omitted), *cert. denied*, 415 U.S. 917, 39 L. Ed.
> 2d 471, 94 S. Ct. 1413, 94 S. Ct. 1414 (1974). Thus, if a prosecutor plans and
> executes a raid on a suspected weapons cache, he "has no greater claim to complete
> immunity than activities of police officers allegedly acting under his direction." 484
> F.2d at 608-609.

*Buckley*, 509 U.S. 259, 273-74, 113 S. Ct. 2606, 2616 (1993). Accordingly, "[w]hen the functions

of prosecutors and detectives are the same, . . . the immunity that protects them is also the same."

*Id.* at 274.

The Supreme Court has declined to establish bright-line rules to determine whether a

prosecutor is acting as an advocate, subject to absolute immunity, or as an investigator or an

administrator, subject only to qualified immunity. *Odd v. Malone*, 538 F.3d 202, 210 (3d Cir.

2008). Instead, in determining the nature of a prosecutor's actions, courts have found relevant the

timing of the actions. *Odd*, 538 F.3d at 213; *see also Murphy*, 2017 U.S. Dist. LEXIS 56663, at

*20. For example, "pre-indictment and post-conviction actions are more likely administrative than

advocative," *Odd*, 538 F.3d at 213, and a "prosecutor neither is, nor should consider himself to be,

an advocate before he has probable cause to have anyone arrested." *Buckley*, 509 U.S. at 274.

In *Burns v. Reed*, the Supreme Court considered whether absolute immunity applied for a prosecutor's participation in a probable cause hearing, and for the prosecutor's legal advice to police officers in the investigative stage. *Burns*, 500 U.S. at 487. The Court found qualified immunity for the first, explaining that "appearing before a judge and presenting evidence in support of a motion for a search warrant -- clearly involve the prosecutor's 'role as advocate for the State,' rather than his role as 'administrator or investigative officer.'" *Id.* at 491. In contrast, the Court disallowed absolute immunity for "advising the police in the investigative phase of a criminal case" because that role was not "'intimately associated with the judicial phase of the criminal process.'" *Id.* at 493.

In *Buckley*, the Supreme Court considered whether prosecutors were absolutely immune for allegedly fabricating evidence during the preliminary investigation of a crime and making false statements at a press conference announcing the return of an indictment. Addressing the first issue, the Court found that in allegedly fabricating evidence during preliminary investigation of the crime, prosecutors were not entitled to prosecutorial immunity because during the period of the alleged fabrication of evidence, "[t]he prosecutors [did] not contend that they had probable cause to arrest petitioner or to initiate judicial proceedings during that period. Their mission at that time was entirely investigative in character." *Buckley*, 509 U.S. at 274. Because the prosecutors were performing the functions normally performed by investigators, they were entitled only to qualified immunity. *Id.* at 276. Regarding the prosecutors statements during a press conference, the Court determined that these statements were not entitled to absolute immunity, as "[t]he conduct of a press conference does not involve the initiation of a prosecution, the presentation of the State's case in court, or actions preparatory for these functions." *Id.* at 278. Instead, the Court explained

8

that in performing this action, the "prosecutor is in no different position than other executive officials who deal with the press, and, . . . qualified immunity is the norm for them." *Id.*

In *Van De Kamp v. Goldstein*, the Court considered whether prosecutors were entitled to prosecutorial immunity where a prosecutor failed to train other prosecutors on the subject of impeachment related information, and failed to create a system for prosecutors that handled criminal cases to access information "pertaining to the benefits provided to jailhouse informants and other impeachment information." *Van de Kamp v. Goldstein*, 555 U.S. 335, 341 (2009). The plaintiff characterized this failure to disclose as an "administrative procedure" not subject to absolute immunity, because it is related to the training and supervision of prosecutors. *Id.* at 339. The Supreme Court disagreed, explaining that "prosecutors involved in such supervision or training or information-system management enjoy absolute immunity from the kind of legal claims at issue here, [which] focus upon a certain kind of administrative obligation – a kind that itself is directly connected with the conduct of a trial." *Id.* at 344. The Supreme Court distinguished these administrative functions from other administrative duties, such as payroll administration or workplace hiring, because these administrative functions "required legal knowledge and the exercise of related discretion, *e.g.* in determining what information should be included in training, supervision, or information-system management." *Id.* at 344. In short, the Supreme Court did not wish to see an "end run around prosecutorial immunity" by restyling a complaint as an administrative or information-system activity rather than as a prosecutorial action. *Section 1983 Federal Judicial Center*, at 137 (Third Ed. 2014).

Even more, the Third Circuit has acknowledged that a prosecutor may not enjoy prosecutorial immunity for deliberately destroying exculpatory evidence or for failing to preserve exculpatory evidence, but is entitled to absolute immunity for these types of actions "so long as

they did so while functioning in their prosecutorial capacity." Meanwhile, immunity applies to post-conviction proceedings, so long as "the prosecutor is personally involved . . . and continues his role as an advocate." *Yarris*, 465 F.3d at 136-139 (quoting *Spurlock v. Thompson*, 330 F.3d 791, 799 (6th Cir. 2003)); *Munchinski v. Solomon*, 747 F. App'x 52, 57 (3d Cir. 2018); *see also Rose v. Bartle*, 871 F.2d 331, 344 (3d Cir. 1989) (explaining that prosecutorial immunity applies even where "a federal prosecutor and a cooperating witness had conspired to use perjured testimony . . . in order to convict appellants").

Overall, prosecutors may assert absolute immunity when engaged in the following activities:

- deciding whether to prosecute;
- engaging in pretrial litigation activities concerning applications for arrest and search warrants, bail applications and suppression motions;
- appointing special prosecutor;
- making decisions concerning extradition;
- preparing for trial, including interviewing witnesses and evaluating evidence;
- failing to turn over exculpatory material to defense;
- introducing evidence;
- plea bargaining;
- entering into release-dismissal agreement;
- making sentencing recommendations; and
- failing to disclose exculpatory material to defense in post-conviction proceedings.

Section 1983, Federal Judicial Center, at 133 (Third Ed. 2014).

IV.

Qualified immunity protects executive officials who violate a petitioner's federally protected right, so long as the right was not clearly established by law. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Whether government officials can assert qualified immunity is resolved by a two-part test: (1) whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right and, if so; (2) whether the right at issue was "clearly established" at the time

of the defendant's alleged misconduct. *Walker v. Coffey*, 905 F.3d 138, 144 (3d Cir. 2018); *Saucier v. Katz*, 533 U.S. 194, 201 (2001). It is within the Court's discretion in addressing "either of these questions first, in light of the circumstances in the particular case at hand . . . ." *Walker*, 905 F.3d at 144.

"[T]he clearly established right must be defined with specificity." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019). Thus, "[a] clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Reichle* v. *Howards*, 132 S. Ct. 2088 (2012)). Qualified immunity is designed to allow government officials to make reasonable judgments, even if they are mistaken, about open legal questions. It is intended to protect "all but the plainly incompetent or those who knowingly violate the law." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017)). Qualified immunity has been defined as a "fair warning" standard by the Supreme Court, meaning that if the federal right is clearly established, the official is sufficiently on notice and may be held monetarily liable. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Qualified immunity "will attach if the official can demonstrate his conduct was 'objectively reasonable.'" *Davis v. Malitzki*, 451 F. App'x 228, 232 (3d Cir. 2011).

A right is clearly established when precedent exists that is similar to the case at hand, although the facts of the precedent do not need to be "materially similar." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Hope*, 536 U.S. at 739. While there is no need for a "case directly on point . . . existing precedent must have placed the statutory or constitutional question beyond debate," and the "violative nature of particular conduct" must not be defined at a "high level of generality." *Ashcroft v. Al-Kidd*, 131 S. Ct. 2074, 2083-84 (2011). To determine whether a right is clearly established, "we look first for 'applicable Supreme Court precedent.' If none exists, we

consider whether there is a case of controlling authority in our jurisdiction or a 'robust consensus of cases of persuasive authority in the Courts of Appeals that could clearly establish a right for purposes of qualified immunity.'" *Barna v. Bd. of Sch. Dirs. of the Panther Valley Sch. Dist.*, 877 F.3d 136, 142 (3d Cir. 2017) (citing *Mammaro v. N.J. Div. of Child Prot. & Permanency*, 814 F.3d 164, 169 (3d Cir.), as amended (Mar. 21, 2016)). "The clearly established law must be 'particularized' to the facts of the case. . . . [o]therwise, plaintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *White*, 137 S. Ct. at 552 (quoting *Anderson*, 483 U. S. at 640). However, "the unconstitutionality of outrageous conduct obviously will be unconstitutional," and "officials can still be on notice that their conduct violates established law in novel factual circumstances." *Safford Unified Sch. Dist. #1 v. Redding*, 557 U.S. 364, 378-79 (quoting *Hope*, 536 U.S. at 741).

Accordingly, some of the actions that prosecutors and investigators may assert qualified immunity include:

- holding a press conference;
- engaging in investigative activity prior to the establishment of probable cause to arrest;
- providing the police with legal advice during the investigative phase;
- ordering police to conduct warrantless arrests; and
- participating in execution of material witness warrant.

Section 1983, Federal Judicial Center, at 134 (Third Ed. 2014).

V.

Since the Defendants are named independently throughout the sixteen allegations but are not clearly identified as to their role within Kamienski's prosecution, each Defendant is identified below by their role and responsibilities in the prosecution.

James A. Churchill

Defendant James A. Churchill, an investigator with the Ocean County Prosecutor's Office (hereinafter "OCPO") was promoted to lieutenant in 1981, promoted to the captain of detectives in 1988, and to interim chief of detectives in 1991. (Pl. SOF. ECF No. 158, at ¶ 236).[2] At his deposition, Churchill acknowledged that during the investigation of the DeTournay murders and drug transactions, he "basically . . . was in charge of the investigators from the Prosecutor's office who worked on the case." (*Id.* at ¶ 238). He performed supervisory duties during the investigation, from September 1983, through the grand jury indictment in 1988, as well as the trial and post-trial motions in 1988. (*Id.* at ¶ 237). He continued these supervisory duties throughout the appeals process between 1989 and 1992, during the filing of Kamienski's habeas petition between 2002 and 2006, and through the Third Circuit appeal in 2006. (*Id.*)

Churchill also performed investigative functions for the OCPO from 1970 through 1995, and from 1997 to 2006. These duties continued throughout the Kamienski investigation. (*Id.* at ¶ 239-40). The investigative functions performed by Churchill included interviewing witnesses, reviewing evidence, meeting daily with the team of agents conducting other aspects of the investigation, conducting a polygraph test, and choosing what evidence should be analyzed through forensic examination. (*Id.* at ¶ 240).

---

[2] Plaintiff submitted an additional "corrected" response and counter-statement of material facts. *See* ECF No. 169. It is not clear what, if any, difference there is between Plaintiff's original response and counter-statement of material facts and the corrected version. Further, it is not clear whether Plaintiff sought leave from the Court to file the corrected version. Defendants have not responded to the corrected version. Accordingly, the Court reviews the original response and counter-statement of material facts. *See* ECF No. 158.

Daniel T. Mahony

Defendant Daniel T. Mahony performed investigative duties at the OCPO from 1977 until 1995 and from 1997 until 2007. (ECF No. 166, at ¶ 279). He was hired by Churchill, and he was the lead case agent on the Kamienski investigation from 1983 through the trial. (*Id.* at ¶ 281, 283). Mahony also held supervisory positions, including being a sergeant from 1988 to 1990, a lieutenant from 1990 to 1995, and the chief of investigators from 1997 to 2007. (*Id.* at ¶ 279). Mahony initially stated he did not participate in drug investigations after 1980, but later explained that he participated in arresting Donna Duckworth[3] on drug charges in 1985 and participated in searching Kamienski's boat for controlled drug substances at that time. At the time of his deposition in March 2017, he could not recall what probable cause the OCPO had to obtain the warrant for search of Kamienski's boat. (*Id.* at ¶ 280). Mahony testified that he would generally discard any notes he had created. (ECF No. 166, ¶ 282).

E. David Millard

Defendant E. David Millard became a part-time prosecutor at the OCPO beginning in May 1987 and continuing for about eight years, during which time he served as a trial team leader. (Ex. D, Dep. Of E. David Millard, T12:9-14:7). Millard was then the Ocean County Prosecutor from September 1997 until January 2002 and was involved in the Kamienski matter during the Grand Jury proceedings, during the trial and post-trial motions, and Kamienski's sentencing. (E. David Millard Answers to Interrogatories, ECF No. 155-19, Ex. Q, at ¶ 4).

---

[3]      At the time of the investigation, Donna Hmielewski was known as Donna Duckworth. Subsequently, she has changed her name to Donna Hmielewski. (Dep. of Donna Hmielewski, ECF No. 155-5, at T14:1-20). For the purpose of this Memorandum, the Court will refer to her as Donna Duckworth or Duckworth.

The DeTournay trial was Millard's first murder trial. (Pl. SOF, at ¶ 133). Millard was the sole prosecutor handling the case at trial, and he was solely responsible for selecting the witnesses and physical evidence for the State's case. (*Id.* at ¶ 143).

In addition, Millard presented the DeTournay matter to the Grand Jury. Millard also handled the prosecution of Donna Duckworth on an unrelated drug charge that had been initiated prior to his arrival. (Def. Response to Statement of Material Facts, ECF No. 166, at ¶¶ 130-135).

James W. Holzapfel

Defendant James W. Holzapfel was the Ocean County Prosecutor from May 1987 to the fall of 1992. The County Prosecutor is the highest executive position in the office, and Holzapfel directly supervised Terrance Farley, the First Assistant County Prosecutor (on legal issues) and also supervised Chief of Detectives, Palmer Herbert and James A. Churchill (on investigative issues).

Assistant County Prosecutor Farley oversaw trials and appeals. During his tenure, the OCPO's office, undertook the following activities: (1) investigated Kamienski's alleged involvement in the DeTournay murders and drug charges; (2) tried Kamienski on murder and drug charges; (3) opposed Kamienski's post-trial motion for judgment of acquittal; and (4) filed the appellate brief seeking reinstatement of the murder charges which the trial judge had dismissed.

Plaintiff alleges that no other person at the OCPO had oversight over ethical issues or ethics training during Holzapfel's tenure. (ECF No. 166, ¶¶ 42-45).

Thomas F. Kelaher

Defendant Thomas F. Kelaher was the Ocean County Prosecutor from January 2002 to July 2007, during which time the OCPO opposed Kamienski's habeas petition. (*Id.* at ¶ 62). During most of Kelaher's tenure, Terrance Farley was the First Assistant County Prosecutor. Defendant

John Mercun was the Executive County Prosecutor, and Defendant Samuel J. Marzarella was in charge of the criminal appeals unit. Also, during Kelaher's tenure, the OCPO did not have an ethics officer or "formal ethics training." (*Id.* at ¶¶ 62-67).

Marlene Lynch Ford

Defendant Marlene Lynch Ford was the Ocean County Prosecutor from June 27, 2007 to March 22, 2013, which included the time period during which Kamienski's habeas petition appeal was pending in the Third Circuit. During most of Lynch Ford's tenure, Defendant Ronald F. DeLigny was the First Assistant County Prosecutor. William Heisler was the Executive County Prosecutor. In addition, DeLigny was the designated ethics officer, and Samuel J. Marzarella was the head of the appeals unit. Charles Kyle was the chief investigator. (*Id.* at ¶¶ 76, 79-83).

Ronald DeLigny

Ronald DeLigny was employed as an Assistant County Prosecutor from September 1987 to July 1, 2012. DeLigny claims he was never the ethics officer. However, this contradicts Defendant Marlene Lynch Ford's testimony (see above). DeLigny also alleges that his first and only involvement in the Kamienski matter occurred after the Third Circuit's reversal, when the OCPO was considering filing a petition for certiorari to the U.S. Supreme Court. He claims that he was unaware of any aspect of the Kamienski investigation, trial, appeal, or habeas litigation. (ECF No. 166, ¶¶ 117-118).

Samuel J. Marzarella

Defendant Samuel J. Marzarella is or was the head attorney in the Appeals Unit at the OCPO from September 1986 to 1991, and then again from March 2002 until at least 2017. During the latter period he became a Supervising Attorney (circa 2006/2008) and then Chief of Appeals (2015). (Pl. SOF at ¶¶ 355-56). Marzarella drafted the brief seeking to reverse Judge Perskie's

JNOV decision submitted to the Appellate Division (ECF No. 166, ¶ 8, 33). Marzarella also

drafted and argued the Kamienski case before the United States District Court and the Third Circuit

Court of Appeals on the habeas matter, *Kamienski v. Hendricks*, 332 F. App'x 740, 740 (3d Cir.

2009). (ECF No. 166, ¶¶ 9-16).

VI.

This section presents the sixteen allegations engendered by Plaintiff in response to the

motion for summary judgment based on qualified immunity and prosecutorial immunity.

Organizationally, each allegation[4] will be addressed in numerical order except one. Allegation

fifteen will be presented first because it focuses on the essential facts and the most pertinent issue

giving rise to this case.

Allegation 15:

> Defendant Marzarella filing false and misleading briefs on direct appeal, in opposition to
> Kamienski's habeas petition and in opposition to Kamienski's federal appeal. Defendant
> Marzarella attempting to mislead the United States District Court and Court of Appeals at oral
> argument with unsupported and/or false statements as to the record in the underlying trial.
> And, Defendant Millard not stepping in to correct matters once he became County Prosecutor
> and knew or should have known Marzarella had completely distorted the trial record, claiming
> for instance that the evidence showed Kamienski had "premeditated" the murders when
> Millard at trial and during post-trial motion said there was no evidence Kamienski knew in
> advance of his co-defendants' plan to commit a drug robbery, much less a dual murder.

In the supplemental briefing, Plaintiff reframes Allegation 15 as follows:

> > Attorney Marzarella filed false briefs on the direct appeal, during
> > the habeas litigation and in the federal appeal. When Marzarella's
> > misconduct was finally exposed for what it was the Third Circuit
> > reacted by becoming, in the words of a member of the panel, "almost
> > apoplectic." The Third Circuit further excoriated Marzarella for
> > filing "misleading" and "totally improper" briefs in order to try to
> > perpetuate Kamienski's murder convictions, which had been
> > wrongful secured from the beginning. *Kamienski v. Hendricks*, 332
> > F. App'x 740, 744 n.8 and n. 9 (3d Cir. 2009) and Ex. 12 at 20:3-

---

[4] Each allegation is quoted from Plaintiff's brief. On many of the allegations, Plaintiff substantively reframed them in his supplemental brief to which defendants may not have responded fully.

23, 21:1-2 and 21:3-9. This statement, in and of itself, is compelling evidence that Marzarella violated Kamienski's well-established constitutional rights to fair legal proceedings. *See Rochin v. California*, 342 U.S. 165, 172 (1952) (the Due Process Clause of the Fourteenth Amendment is violated by conduct that "shocks the conscience"). If the Court similarly concludes that Marzarella's conduct "shocks the conscience" then he would not be entitled to absolute or qualified immunity.

(Pl. Supp. Br., ECF No. 186, at 32-33).

By way of background, Kamienski was tried on an indictment alleging conspiracy to distribute drugs and murders of the DeTournays, and he was convicted on both counts. Judge Perskie found his instruction of murders as it applied to Kamienski was flawed, and he ruled on a judgment notwithstanding the verdict (JNOV) to set aside the murder convictions based on the improper charge. On appeal, Judge Stephen P. Perskie's ruling was reversed, and the murder conviction was reinstated. On remand, Judge Perskie imposed a sentence of two life sentences with thirty years parole ineligibility for the murder convictions, and consecutive terms of twelve years imprisonment for the drug conspiracy convictions. *Kamienski v. AG for N.J.*, Civil Action No. 11-3056 (PGS), 2012 U.S. Dist. LEXIS 130046 (D.N.J. Sept. 12, 2012). Kamienski was confined from 1988 through 2007, at which time the Third Circuit found that Perskie's JNOV was correct and it set aside the Appellate Division's decision. As a result, Plaintiff alleges that the actions of the trial attorneys of the Ocean County Prosecutor's Office culminated in Marzarella's allegedly misleading appellate and habeas briefs.

Initially, this is the most significant issue because in order to prove a § 1983 case one must establish (1) conduct by a person; (2) who acted under the color of law; (3) proximately causing; and (4) deprivation of a federally protected right. Here, Kamienski's loss of liberty (incarcerated for nearly 20 years) was proximately caused by the reversal of Judge Perskie's JNOV to set aside the murder conviction by the Appellate Division allegedly due to Marzarella's brief.

Prosecutor Marzarella worked on both the direct appeal and Plaintiff's habeas petition. (*See* Dep. of Samuel Marzarella, ECF No. 155-27, at 17:17-55; 45:25-46:4). According to Kamienski, Marzarella "filed false briefs on the direct appeal, during the habeas litigation and in the federal appeal." (Pl. Supp. Br., ECF No. 186, at 32). Kamienski claims that by filing these allegedly false and misleading briefs, Marzarella denied him his due process right to a fair trial. (*Id.* at 33). Even more, according to Kamienski, if these false and misleading briefs were not filed, the Appellate Division would not have reinstated his murder conviction, and it is "highly unlikely the District Court would have denied" his habeas petition. (*Id.*)

In support of this proposition, Kamienski points to the Third Circuit's decision in *Kamienski v. Hendricks*, 332 F. App'x 740, 745 (3d Cir. 2009), and comments made by Third Circuit Judges during oral argument for the habeas petition. Kamienski argues that one member of the panel "excoriated Marzarella for filing 'misleading' and 'totally improper' briefs in order to try to perpetuate Kamienski's murder convictions . . . ." (*Id.*) Kamienski highlights portions of both the briefs on direct appeal and the briefs before the Third Circuit, in an effort to show specific instances where the briefs were misleading. (*See* PSOF, ECF No. 169, at ¶¶ 371-388; 400-407; 412; 423). Regardless, Kamienski rightly notes that "[t]o permit Kamienski to go forward on this claim, the Court would have to determine that an appellate attorney opposing a federal habeas petition is not entitled to absolute immunity." (*Id.* at 33). Rather, Plaintiff argues that Marzarella's conduct "shocks the conscious" and absolute immunity should not apply. (*Id*). However, Kamienski's arguments are without merit.

As previously explained, the Third Circuit has held that "[a]bsolute immunity applies to the adversarial acts of prosecutors *during post-conviction proceedings* . . . where the prosecutor is personally involved . . . and continues his role as an advocate . . . ." *Yarris*, 465 F.3d at 137 (quoting

*Spurlock v. Thompson*, 330 F.3d 791, 799 (6th Cir. 2003) (emphasis added)). Here, it is clear that

during the direct appeal and during the habeas proceeding, Marzarella was personally involved,

and continuing his role as advocate for the State by engaging in activity "intimately associated

with the judicial phase of the criminal process" – drafting and arguing briefs before the courts.

*Imbler*, 424 U.S. at 430. Accordingly, Marzarella is entitled to prosecutorial immunity for filing

allegedly false and misleading briefs before the courts.

More so, the Court declines to find that Marzarella's conduct here "shocks the conscious."

First, the comments made by counsel or a judge at oral argument for the habeas petition must be

viewed in light of the Third Circuit's opinion. *See Kamienski*, 332 F. App'x at 745. Second,

Kamienski mischaracterizes the Third Circuit's comments regarding "misleading" aspects of the

briefs. The first comment discusses Duckworth's testimony regarding the knots Kamienski would

tie and the knots used to tie the bodies to the cement blocks. *Id.* at 744. The Third Circuit explained:

> [t]he government makes much of this testimony on appeal . . .
> However, the state's selective reliance on that testimony is
> misleading because Duckworth conceded on cross examination that
> there was nothing unique about the knots, and that the hitch knot is
> a common boater's knot . . . Accordingly, the fact finder could only
> conclude from that portion of her testimony that Kamienski knew
> how to tie a common "hitch knot," used in boating.

*Id.* at 744 n.8.

The second comment discusses how, throughout the brief before the Third Circuit, the

government:

> used the term "defendants" in a manner that included Kamienski
> without specifying which of the three defendants the evidence refers
> to. In several of those references, the evidence being discussed
> pertained only to Marsieno and/or Alongi, and not to Kamienski.
> Moreover, the government's brief frequently includes facts based on
> testimony that was admitted only against Marsieno and/or Alongi.
> Although counsel does note that such evidence was admitted only
> against the other defendant(s), it is clearly irrelevant in determining

20

if the evidence admitted against Kamienski was sufficient. Moreover, including such evidence in the brief is both unhelpful and misleading as only Kamienski's appeal is before us. Counsel for the government has consistently either misunderstood or ignored the limitations and propriety of including such evidence responding to Kamienski's appeal.

*Kamienski*, 332 F. App'x at 744 n.9.

While the Third Circuit expressed disapproval, neither of these comments rise to the level of conscience-shocking activity that Courts have previously found to be violative of due process. Courts have consistently held that "[f]or behavior by a government officer to shock the conscience, it must be more egregious than 'negligently inflicted harm,' as mere negligence 'is categorically beneath the threshold of constitutional due process' . . . Instead, 'only the most egregious official conduct can be said to' meet that standard." *Haberle v. Troxell*, 885 F.3d 171, 177 (3d Cir. 2018). Kamienski has failed to show how Marzarella's actions "shock the conscience" such that he should be denied absolute immunity. Accordingly, because prosecutors are absolutely immune for actions in presenting the Governments case, i.e., drafting briefs and presenting arguments at argument, the Court finds Marzarella and Millard is immune. In addition, there is little evidence presented in this allegation related to Millard's failure to "step in."

Although the Court will analyze, separately, the merits of Plaintiff's fourteen remaining allegations, the Court notes at the outset that there is some doubt as to whether the deprivation of Kamienski's liberty (i.e. his period of incarceration) was proximately caused by any of the remaining allegations against the defendants. As explained above, see Section II, the Appellate Division's reversal of the JNOV entered by Judge Perskie appears to be the leading cause of Plaintiff's alleged deprivation of his liberty interests. A more in-depth analysis of the deficiencies of Plaintiff's remaining allegations follows.

<u>Allegation 1</u>:  Defendants Mahony, Churchill and Millard did not attempt to construct a meaningful timeline to determine whether or not Kamienski could have been at the scene of the murders, supplied the towel and blankets recovered with the bodies, and tied the knots on a rope around one of them.

In his supplemental brief, Plaintiff reframes this allegation as "Investigating officers Churchill and Mahony and Attorney cum Investigator Millard failed to fully investigate the DeTournays' murders by creating a legitimate timeline as to Kamienski's involvement in the murders." (Pl. Supp. Br., ECF No. 186, at 17). Plaintiff argues that the failure to create a timeline was a violation of his Constitutional right to due process secured by the Fourteenth Amendment, in violation of his right for a full and fair investigation. (ECF No. 186, at 7). Plaintiff alleges that several facts warranted the creation of a timeline by Defendants Millard, Churchill and Mahony. (ECF No. 158, at ¶ 294-315). Although Plaintiff's claim is akin to a claim for reckless investigation or for failure to investigate, he specifically alleges the failure to develop a timeline. Most of the facts that Plaintiff alleges in support of this claim relate to timing impossibilities or improbabilities that would have become evident had a timeline been created; such a timeline would have shown that it was unlikely, if not impossible, for Plaintiff to have been at the murder scene. (*Id.* at 18-19).

Defendants, on the other hand, argue, *inter alia*, that there is no constitutional right to such a timeline, that Plaintiff's theory relies on speculation rather than evidence, that the evidence of the case establishes Plaintiff as the middleman to the drug conspiracy (which implies that he was present at the scene), and that Duckworth's testimony placed him at the scene of the murders. (ECF No. 194, at 2). Moreover, if a timeline was applicable to the case, it may have been the duty of Kamienski's trial counsel to create and display it during the trial, not the investigators. (*Id.*)

Most of the facts alleged by Plaintiff pertaining to the timeline allegation involve Defendant Mahony (ECF No. 158, at ¶ 294-315), who was assigned to investigate the deaths of

the DeTournays. (Ex. C., Mahony's Answers to Interrogatories, P5, at 153). In fact, the section of Plaintiff's statement of material facts designated "timeline" barely mentions Defendants Millard or Churchill. In this section, Plaintiff solely alleges that Mahony "agrees that generally a homicide investigator should create a timeline of significant events and one should have been created in the DeTournay case specifically." (*Id.* at ¶ 294). To be clear, Defendant Mahony testified in his deposition that he *did* create a timeline of the case; he just did not remember exactly how he created it, or when he created it. (Ex. C., of Dep. of Mahony, T34:2-18). However, Plaintiff still alleges that Mahony "never tried to ascertain the travel times between the various places where key events took place on the day of the murders" (e.g. Toms River Holiday Inn and Lakewood Holiday Inn, Alongi residence, Oceanside Marina and O'Donnell residences) and further an outline would have shown that Plaintiff could not have been present at the scene of the murders. (EFC No. 158, at ¶ 312).

Specifically, Plaintiff argues that trial witness Jeffrey reported seeing Barbara DeTournay alive in a room at the Toms River Holiday Inn at 6:15 p.m., but that Duckworth reported seeing both DeTournay bodies on the boat at 6:45 p.m. (Dep. Of Mahony, ECF No. 155-24 at T189:22 – 190:8). Plaintiff has provided Google Map directions that purport to show the distance between the Toms River Holiday Inn and the Alongi residence. According to Plaintiff, because Google estimates the drive time to be eight minutes from the Toms River Holiday Inn (not including the time it would take Barbara to walk from her room to the vehicle) to the Alongi residence (Ex. C, Google Map: 617 Baron Street, Toms River, NJ to 290 Highway 37, Toms River, NJ, P165), it would have been nearly impossible for Duckworth to have seen the bodies at 6:45 p.m. if Barbara had only just arrived at the Alongi residence around 6:30 p.m. (Dep. of Mahoney, ECF No. 155-24 at T190: 3-8). Moreover, Plaintiff alleges that Mahony did not take into account the ten to

twelve minutes it would have taken Kamienski to travel from his marina to the home of Janet O'Donnell to pick up Duckworth (Ex. C, Google Maps: 118 Franklin Ave to 3161-3169 W Central Ave, P356 ), or the eighteen minutes it would have taken Kamienski to travel from his marina to the Alongi residence (Ex. C. Google Maps: 617 Baron Street, Toms River, NJ to Aqua Rentz Boat Rentals, P357).

Regarding Defendant Churchill, Plaintiff alleges in a different section of his statement of material facts that Churchill simply "cannot recall preparing a timeline with the Kamienski investigative team and never discussed with them the strengths and weaknesses of the evidence as it came in." (ECF No. 158, ¶ 243).

Regarding Defendant Millard, Plaintiff argues in a separate section of his statement of material facts that Millard argued to the jury that Plaintiff drove his boat to Alongi's house on the night of the murders and later picked up Duckworth at her friend's house in his car and brought her back to Alongi's house where she saw the bodies, and that Millard mistakenly believed that Plaintiff could have made that trip in 10-15 minutes. (ECF No. 158 at ¶ 145-146). Plaintiff also alleges that Millard failed to prepare a sufficiently detailed timeline/chronology of the events that occurred on the day of the murders. (*Id.* at ¶ 144).

The Supreme Court has explained that such due process violations must not be defined at a "high level of generality." *Ashcroft*, 131 S. Ct. at 2083-84. Kamienski's argument that failure to develop a sufficiently detailed timeline is a due process violation does not support the argument. In fact, none of the cases cited by Kamienski hold same. *See generally Wilson v. Lawrence County*, 260 F.3d 946, 957 (8th Cir. 2001); *Gardenshire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000); *Sanders v. English*, 950 F.2d 1152, 1162 (5th Cir. 1992); *Whitley v. Seibel*, 613 F.2d 682, 686 (7th Cir. 1980); *Briscoe v. Jackson*, 2. F Supp. 3d 635, 644 (E.D. Pa. 2014); *Whitley v. Allegheny Cty.*,

2010 U.S. Dist. LEXIS 21262, at *106 (W.D. Pa. Mar. 9, 2010); *Walker v. Spiller*, 1998 U.S. Dist. LEXIS 8428, at *19 (E.D. Pa. June 9, 1998). At best, the failure to develop a timeline may be akin to allegations that defendants failed to adequately investigate crimes, but the failure to investigate does not constitute clearly established due process rights (See, Section IV, p. 10-12). Thus, the result is the same. The court in *Thomas v. City of Phila.*, 290 F. Supp. 3d 371, 386 (E.D. Pa. 2018) explained:

> There is "no constitutional right to a police investigation." *E.g., Whitehead v. City of Phila.*, No. 13-2167, 2014 U.S. Dist. LEXIS 21000, 2014 WL 657486, at *2 (E.D. Pa. Feb. 19, 2014). As this Court put the matter in *Wright*, "[i]t certainly remains to be seen whether there is an independent cause of action under the Fourteenth Amendment . . . for 'failing to conduct a constitutionally adequate investigation,' and the *Court will not affirmatively recognize one here at this time*." 229 F. Supp. 3d at 332 n.3 (emphasis added). . . . [T]he Third Circuit Court of Appeals has not recognized such a cause of action. Even if such a constitutional cause of action exists, it is not — and certainly was not in the mid-1990s — clearly established, meaning that the defendants are (or would be) shielded by qualified immunity anyway. *See, e.g., Ashcroft v. Al-Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011); *Mammaro v. N.J. Div. of Child Protection*, 814 F.3d 164, 169 (3d Cir. 2016).

Moreover, even if this Court were to construe this claim as one for "reckless investigation," the Third Circuit recently noted that a claim for "reckless investigation" has not yet been recognized; accordingly, "no such constitutional right . . . was 'clearly established' at the relevant time, as required to overcome qualified immunity." *Geness v. Cox*, 902 F.3d 344, 354 n.5 (3d Cir. 2018). As explained in Section II, *supra*, a Plaintiff must show that 1) a constitutional right has been violated, and 2) the right was clearly established to defeat qualified immunity. *See Walker*, 905 F.3d at 144. Here, there is simply no precedent that an investigator must create a timeline. Even viewing the facts in a light most favorably to Plaintiff, and thus assuming that Mahony stated

that "generally a homicide investigator should create a timeline of significant events and one should have been created in the DeTournay case specifically," this amounts only to a claim of negligence. Negligence does not trigger a constitutional violation. *See Daniels v. Williams*, 474 U.S. 327, 334 (1986); *Baker v. McCollan*, 443 U.S. 137, 144 (1979). For these reasons, Defendants Mahony and Churchill are entitled to qualified immunity for this claim. (See Section IV, p. 10-12).

With regard to Defendant Millard, he is entitled to absolute immunity because his statements at trial clearly fall within his role as an advocate for the State, i.e. the judicial phase. *See Imbler*, 424 U.S. at 430. Among the facts alleged by Plaintiff relating to the timeline, the only facts that implicate Millard involve his closing argument at trial. (ECF No. 158, at ¶ 145-46). Utilizing the functional analysis test, only the function of Millard's statement needs to be evaluated regarding this allegation. *Buckley*, 509 U.S. at 269. The function of a closing argument clearly falls within the judicial phase of a case as opposed to an investigative or administrative phase, and therefore Millard is entitled to absolute immunity. (*See*, Section III, pp. 5-10).

<u>Allegation 2</u>: Mahony, Churchill and Millard did not adequately debrief the last persons to see the victims alive as well as other possible witnesses (such as Mr. Jeffrey and Skip Hunt) who could have attested to Kamienski not being present at the scene of the murders or provided information that would have allowed Kamienski to show that it would have been impossible for him to have been there.

Plaintiff reframes this issue in his supplemental brief as "Investigating Officers Churchill and Mahony and Attorney cum Investigator Millard failed to fairly and fully debrief State trial witnesses Sidney Jeffrey, III, and George ("Skip") Hunt." (Pl. Supp. Br., ECF No. 186, at 19). Plaintiff also alleges that Defendants Millard, Churchill and Mahony violated his constitutional due process right to a full and fair investigation by failing to "fairly and fully debrief State trial witnesses Sidney Jeffrey, III and George ("Skip") Hunt." (ECF No. 186 at 19). Most notably, Plaintiff argues that Defendants failed to ask Hunt if Alongi was operating his boat alone on the evening of the murders. (*Id.* at 20). Defendants argue, in turn, that Plaintiff's trial counsel had "ample opportunity" to debrief these witnesses at trial, and assert that Duckworth's testimony placed Plaintiff at the scene. (ECF No. 194, at 3).

Mr. Hunt resided directly across the street from the Alongi residence. (Ex. C., OCPO Supp. Invest. Rep., at 166). Plaintiff alleges that Skip Hunt contacted Detective Peter Fitzsimmons shortly after the homicides were discovered and advised Fitzsimmons that he observed Nick DeTournay at the Alongi residence shortly before the murders occurred. (Pl. SOF at ¶ 316). Hunt also conducted some type of surveillance of the Alongi residence after the murders at the request of the OCPO. (*Id.* at ¶ 317). Hunt told Detective Fitzsimmons that, on occasion, he previously had seen Plaintiff's distinctive and loud Avanti car, or his large yacht with a fly bridge at the Alongi residence during the summer or fall of 1983. (*Id.* at ¶ 323-24). Moreover, in 2008, Plaintiff submitted as part of his habeas petition a report of a telephone interview of Skip Hunt by Plaintiff's

counsel which also suggests that Hunt did not see the scene at the time of the murders. (*Id.* at ¶ 403-05).

Regarding Defendant Mahony, Plaintiff alleges that Hunt spoke with Mahony between twelve and fifteen times during the Kamienski investigation and trial preparation. (*Id.* at ¶ 318-320). He alleges that Mahony "waited four years after Skip Hunt contact[ed] Detective Fitzsimmons to interview him, and Mahony cannot explain the delay." (*Id.* at 322). In addition, he alleges that Mahony cannot recall asking Hunt whether he had seen Plaintiff's car or yacht at the Alongi residence on the day of the murders. (*Id.*) Plaintiff alleges that Mahony's record of his interview with Hunt, is silent about other details of Hunt's observations. From this, Plaintiff deduces that Mahony asked about the details of Hunt's observations, but he did not record them because the replies did not support the prosecutor's theory. (*Id.* at ¶ 328-30). Moreover, Plaintiff alleges that there is another similar incident. In that incident, Plaintiff argues that Hunt claimed to have twice seen Alongi operating his boat in the lagoon leading to Barnegat Bay around the times of the murders in an unusual manner, and Mahony cannot recall asking Hunt whether Alongi was alone. (*Id.* at ¶ 326-27). Plaintiff deduces that since Mahony's report of the interview is silent, Mahoney did not record same because it does not support the prosecutor's theory. (*Id.* at ¶ 330). Moreover, Plaintiff alleges that Mahony has no recollection that Skip Hunt was the last person to see Nick DeTournay alive. (*Id.* at ¶ 334). Mahony is not implicated in any facts regarding Mr. Jeffrey.

Defendant Churchill is vaguely implicated for failing to debrief Hunt or Jeffrey. Plaintiff only alleges that Churchill "performed investigative functions on the Kamienski case specifically during the pre-trial indictment investigation, including interviewing witnesses, [etc.]..." (ECF No. 158, at ¶ 240). This is insufficient to show any violation of an established right because not only

does Plaintiff fail to point to any law that would support his assertion that adequate debriefing of a witness is a constitutionally protected right, but he also fails to elucidate fully how Churchill violated such right.

Regarding Defendant Millard, Plaintiff alleges that Millard "met with witnesses during the DeTournay investigation." (ECF No. 158, at ¶ 335). More specifically, Plaintiff alleges that Millard spoke with Hunt between two and four times during the Kamienski investigation and trial preparation (*Id.* at ¶ 319), that Millard never asked, and was never told that Hunt he did not see Plaintiff's car or yacht at the Alongi residence on the day of the of the murders. (*Id.* at ¶ 148) Plaintiff further alleges that Millard met with Mr. Jeffrey (*Id.* at ¶ 149), and that Millard called Jeffrey as a witness in the State's case to show that Jeffrey was the last person to have seen Barbara DeTournay alive, but he never asked what time Jeffrey witnessed DeTournay leave the Holiday Inn with one of the participants of the drug deal. (*Id.* at ¶ 208-09).

Again, Plaintiff's claims that Millard and Churchill failed to adequately debrief witnesses are not violations of a due process right. In an analogous case, the court rejected the plaintiff's claim that an arresting officers' failure to take "reasonable" steps to investigate whether the perpetrator had been trespassing, because the officer did not interview witnesses, violated the Plaintiff's constitutional rights. *Briscoe*, 2 F. Supp. 3d at 644. The court held that the claim only amounted to an accusation of negligence, and noted that officers do not need to investigate every claim of innocence. *Id.* Here, too, Plaintiff's allegations only constitute a claim of negligence, and do not illustrate conduct which is an intentional violation of due process or shocks the conscience of the Court.

The Court concludes that Defendants Mahony and Churchill are entitled to qualified immunity because there is no clearly established constitutional right that investigators must

adequately debrief witnesses. Plaintiff relies on cases that center on the claims of a failure to fully investigate or for reckless investigation. *See supra*, at 19-20. However, as explained above, at the time of their actions, "no such constitutional right [to fully investigate] . . . was 'clearly established' at the relevant time, as required to overcome qualified immunity." *Geness*, 902 F.3d at 354 n.5; *see also Thomas*, 290 F. Supp. 3d at 386. Accordingly, the failure to adequately debrief witnesses was never recognized by the courts as an established right. As such, qualified immunity applies.

Finally, Defendant Millard is entitled to absolute immunity for those acts associated with his role as an advocate for the State, i.e. his use of Jeffrey's testimony as the last person to see Barbara DeTournay alive and his failure to elicit the time he saw Barbara DeTournay leave the Holiday Inn. As for other the alleged facts regarding Millard, specifically that he spoke with Hunt during the Kamienski investigation and trial preparation (ECF No. at 158, ¶ 319), he failed to ask and was never told that Hunt said he did not see Plaintiff on the day of the murders (ECF No. 158, at ¶ 148), and that he met with potential witness Jeffrey (ECF No. 158, ¶ 149), it is not clear that absolute immunity is applicable because meeting with witnesses during the investigative phase may not be associated with his role as an advocate for the state, especially given the "heavy burden" to establish absolute immunity. *Light v. Haws*, 472 F.3d 74, 80-81 (3d Cir. 2007). However, this Court does not need to answer same because Millard is protected by qualified immunity for the same rationale as Defendants Mahony and Churchill.

<u>Allegation 3</u>:   Defendant Churchill ignoring the polygraph he had administered on Kamienski which did not report any deception for denials as to being present at, or involved in, the murders.

Plaintiff reframes this allegation in his supplemental brief, arguing that Defendant Churchill failed to fully and fairly consider Plaintiff's polygraph test, which Churchill administered. (*See* Pl. Supp. Br., ECF No. 186, at 20; Pl. SOF, at ¶ 250). Specifically, Plaintiff argues that the polygraph examination did not demonstrate any deception of Plaintiff with respect to his answers to questions about whether he committed the DeTournay murders, whether he had any knowledge of plans to murder the DeTournays or whether Plaintiff helped others to murder the DeTournays. (*Id.* at 20). Plaintiff argues that, from the day the polygraph was administered, Churchill knew, or strongly believed, that Plaintiff did not have anything to do with the murders, even though he may have suspected that Plaintiff had something to do with the related drug transaction.

Plaintiff alleges that Churchill administered a polygraph examination on April 30, 1984 and the only possible "deception" that Churchill noted is with respect to Plaintiff's claim "that he was not specifically told that there was a drug deal between Alongi and the DeTournays just prior to the DeTournays being shot." (ECF No. 158, at ¶ 250). Additionally, Plaintiff's counsel asserts that that Kamienski passed Churchill's polygraph concerning the question of whether he had participated in in the murders of the DeTournays or was present at the scene when they occurred. (*Id.* at ¶ 251). On the other hand, Defendants argue that the polygraph showed Plaintiff to be "both deceptive and concealing information about the murder." (ECF No. 194, p.3).

Plaintiff relies on the same cases cited for the timeline allegation (Allegation 2), and draws particular attention to *Whitley v. Allegheny County*, No. 7-403, 2010 U.S. Dist. LEXIS 21262 (W.D. Pa., Mar. 9, 2010). In *Whitley*, the issue involved "actionable investigative conduct

involv[ing] improper use of, and failure to use, polygraph examinations." (ECF No. 186, at 20); and the plaintiff alleged a constitutional violation stemming from "concealment and falsification of evidence, the discriminatory misuse of interrogation techniques, and the ignorance of exculpatory evidence." *Whitley*, 2010 U.S. Dist. LEXIS 21262 at *86. Most relevant is the claim of ignorance of exculpatory evidence as Plaintiff argues that Churchill ignored the results of the polygraph test. In *Whitley*, however, the court granted a motion for summary judgment for defendants based on qualified immunity. *Id.* at *107. It did so even while reasoning that the allegations of due process violations could reasonably be viewed as reckless by a jury. *Id.* at *106. Significantly, the court found that there was no precedent establishing that the federal right at issue was clearly established at the time of investigation, and stated that it was not "a violation of the Constitution for defendants to conduct recklessly the investigation of Malloy's murder." *Id.* at *107. Moreover, the polygraph issues in *Whitley* focused on failure to administer or lack of training in administering. *Id.* at *22, *39. Here, however, it is clear Churchill competently administered a polygraph test, and, unlike *Whitley*, he was qualified to do so as he had been declared an expert by a court several times. (Dep. of Churchill, ECF No. 155-21, T31:6-8). Given the similarity of facts between *Whitley* and this case, which Plaintiff points out by stating that it involved "improper use of, and failure to use, polygraph examinations. " Although Plaintiff believes that *Whitley* and this case are analogous, the facts are substantially different and distinguishable.

Plaintiff also relies on *Sanders v. English*, which held that an investigator may not knowingly and willingly ignore substantial exculpatory evidence. *Sanders v. English*, 950 F.2d 1152, 1162 (5th Cir. 1992). In that case, an investigator was accused of ignoring multiple credible alibi witnesses, a negative identification by a witness who helped compose a police sketch, and a "belated identification of the victim under peculiar circumstances." *Id.* The court held this evidence

to be "patently exculpatory." *Id.* By contrast, the evidence here is a polygraph test. This case is distinguishable from *Sanders* in that the *Sanders* court did not focus on polygraph tests, and there was no finding that the polygraph test here was branded as "patently exculpatory". Moreover, Defendant Churchill testified in his deposition that his overall conclusion from the polygraph was that Kamienski "knew more information about the circumstances surrounding the death of the DeTournays [sic] than he had already told the police," (Dep. of Churchill, ECF No. 155-21, T31:18-21), which is far from "patently exculpatory." As such, Defendant Churchill is entitled to qualified immunity because there are no facts showing that he knowingly and willingly ignored substantial exculpatory evidence. (*See*, law on qualified immunity, Section IV, pp. 10-11).

Finally, considering the merits of Plaintiff's claim, there is no evidence in the record that Churchill's administration of the polygraph test and his interpretation of the results that Kamienski was answering in a deceptive manner constituted a due process violation.

<u>Allegation 4</u>:  Defendants Mahony, Churchill and Millard, not reviewing the significance of items collected with the bodies when "putting the pieces" of their circumstantial evidence case puzzle together, not properly testing crime scene evidence.

Plaintiff reframes this allegation in his supplemental brief, arguing that Defendants Churchill, Mahony, and Millard failed to "fairly and fully analyze crime scene evidence." (Pl. Supp. Br., ECF No. 186, at 20-21). In support, Plaintiff argues that Defendants Mahony, Churchill, and Millard did not review the significance of the items collected from with the bodies, and did not properly test the crime scene evidence that was recovered. (Pl. Br. ECF No. 158-1 at 26). In furtherance of this allegation, the Plaintiff states:

> Among other things, it would have ruled out Duckworth's incorrect and unsupportable claim that three items found among all the other things recovered with the bodies came from Kamienski's boat, namely, two blankets and a towel. Not only did the misuse of Duckworth's testimony most likely contribute to Kamienski's wrongful conviction, but the blankets and towel were critical facts in the eyes of the Appellate Division [of New Jersey] and U.S. District Court in reinstating Kamienski's murder convictions and denying his habeas petition, respectively. Without Duckworth's false trial testimony as to these items, and the OCPO's subsequent misuse of this testimony, it is highly unlikely that the jury would have convicted Kamienski of murder, the Appellate Division [of New Jersey] would have reinstated the murder charges, or if it did, that the District Court would have denied Kamienski's habeas petition. The significance of Duckworth's false and misleading testimony as to the two blankets and towel cannot be overstated.

In response to this allegation, Defendants claim that all the related physical evidence was collected and sent to the FBI lab for examination. (*See* ECF. No 155-1 at 31-2; ECF No. 194 at 4).

Though Plaintiff alleges Defendants failed to fully and fairly investigate the crime scene evidence, this was not a constitutional right that was clearly established at the time of the investigation, as required to overcome qualified immunity. *See Geness*, 902 F.3d at 354 n.5; *see also Thomas*, 290 F. Supp. 3d at 386. Viewing this allegation most favorable to the non-moving party, this allegation is nothing more than a claim of negligent investigatory practices. In reviewing

the claims against Millard, absolute prosecutorial immunity applies, as evaluating the evidence is one of the protected activities from which a prosecutor is completely immune. *Giuffre*, 31 F. 3d at 1251; *Buckley*, 509 U.S. at 269; *Burns*, 500 U.S. at 486-87; *Imbler*, 424 U.S. at 430. As for the claims against Churchill and Mahony, qualified immunity applies. As stated above, there was no clearly established right at the time of this investigation for a full and fair investigation. Accordingly, because there is no "clearly established" right that was violated, qualified immunity applies to these Defendants. (*See*, law on qualified immunity, Section IV, pp. 10-11).

<u>Allegation 5</u>:  Not adequately considering the FBI lab reports of those items that had been sent for testing. The latter alone would have dispelled Duckworth's testimony that the towel and blankets had come from Kamienski's boat.

Plaintiff reframes this allegation in his supplemental brief, arguing that Churchill, Mahony, and Millard (acting as an investigator) failed to fully and fairly analyze FBI lab reports. (Pl. Supp. Br., ECF No. 186, at 21-22). Plaintiff avers that failure to adequately consider both FBI reports violated his due process right to a full and fair investigation. (*Id.*) As far as the Court can tell, there were at least two requests for analysis of the evidence that were sent to the FBI for testing which resulted in two FBI lab reports: the 1984 and 1988 reports.

Regarding the 1984 report, two blankets were obtained from Plaintiff's boat, which in turn were sent to the lab for testing in October of 1983, along with two other blankets recovered from the victims' bodies. (Pl. SOF, at ¶¶263-65). Several month later, an FBI report dated May 2, 1984 stated that according to Special Agent Andy Podalak the blankets recovered from the victims had not come from Plaintiff's boat. (*Id.* at ¶¶266-67).

Regarding the 1988 report, Defendants Churchill and Mahoney requested that the floral towel found with Nick DeTournay's body be tested for petroleum distillates (wax) because Duckworth claimed that the floral towel resembled the rag that Plaintiff used to polish his boat. (*Id.* at ¶¶260-61). The FBI report dated February 1, 1988 found that the floral towel tested negative for petroleum distillates. (*Id.* at ¶263). According to Plaintiff, "[t]he February 1, 1988 FBI Report suggests (with proper analysis), among other things, that the towel had not been used regularly as a polishing cloth on Kamienski's boat." (*Id.* at ¶263). Plaintiff argues that if the FBI analyzed the hair and fibers in addition to the petroleum distillates, it would have shown the floral towel most likely came from the DeTournay automobile, as opposed to Kamienski's boat because the hair

color was the same as DeTournay. Plaintiff avers that the Reports revealed the hair tests on the blanket showed that the hair found was "red (like Nick DeTournay) and black (like Barbara DeTournay)", which highly suggests that the blankets wrapping the victims' bodies came from their car and "not from the blond-haired Plaintiff's boat." (*Id.* at ¶ 159). The Plaintiff concludes this would have discredited Duckworth's testimony.

According to Plaintiff, "the FBI hair and fiber analysis actually suggests that the blankets came from the victims' own car . . . and the lack of petroleum distillates on the towel contradicted Duckworth's testimony that Kamienski had used that very towel to polish his boat with polishing wax." (ECF No. 186, at 22). In this instance, Plaintiff alleges these claims against Millard (as an investigator), Mahony, and Churchill. Accordingly, the Court examines whether these Defendants are entitled to qualified immunity. As explained above, there is no constitutional claim to a failure to investigate or to properly analyze hair and fiber evidence. *See Geness*, 902 F.3d at 354 n.5; *see also Thomas*, 290 F. Supp. 3d at 386. As such, there is no established due process right that Defendants Churchill, Mahoney, and Millard violated, thus qualified immunity applies. (*See,* law on qualified immunity, Section IV, p. 10-11).

<u>Allegation 6</u>:   Relating to Allegation 5, Millard instructing trial witness Thompson not to bring the FBI reports to court and then asking him to summarize the reports' findings, which Thompson did in a misleading manner, saying they were inconclusive, when, in fact, the reports on the towel and blankets were highly probative of Kamienski's innocence.

Plaintiff reframes this allegation in his supplemental brief, arguing that "Attorney Millard instructed the Ocean County Sheriff['s] Office criminalist Jeffrey Thompson to not bring exculpatory FBI hair and fiber and petroleum distillate reports to court, even though Thompson had reviewed these reports with Millard as part of his trial testimony preparation, [they] were maintained in his office and both he and Millard knew Thompson was going to testify about receiving the FBI reports and their lack of significances to the investigation." (Pl. Supp. Br., ECF No. 186, at 22). Plaintiff is essentially arguing that such conduct constitutes a *Brady* violation of the due process right "to not interfere with defense counsel's access and use of exculpatory evidence." (*See* Pl. Supp. Br., at 22-23). More specifically, Plaintiff alleges that Defendant Millard had several conversations with Thompson in preparation for his testimony in order to discuss the FBI lab reports. As a result of discussions with Defendant Millard, Thompson did not bring the FBI lab reports to trial. (Pl.  SOMF, ECF No. 158 at ¶¶151-155). At trial, Plaintiff alleges that Thompson deceptively testified that he did not have copies of the Reports at the time of his testimony when in fact he deliberately left the FBI lab reports in his office.  Moreover, Thompson responded to questions regarding to the FBI lab Reports, even though the FBI lab Reports were not marked or introduced themselves. (*Id.* at ¶¶156-57, *see also* Ex. B SA0710, SA 0725-26). In addition, Thompson also concluded that the results of the FBI lab Reports were inconclusive. (*Id.* at ¶158, *see also* Ex. B SA0710). Based upon the record before the Court, it does not appear there was any objection to Thompson's testimony by Kamienski's attorney regarding the failure to bring

the FBI Lab Reports to the Court, and Plaintiff's trial counsel examined Thompson on the substance of the FBI Lab Reports. (*Id.*) In addition, Plaintiff does not aver that the FBI Lab Reports were not disclosed to the defense prior to trial.

Pursuant to *Brady v. Maryland*, prosecutors must disclose exculpatory evidence that is material to a defendant's guilt. 373 U.S. 83, 87 (1963). The Supreme Court, in *Giglio v. United States*, 405 U.S. 150, 154 (1972), has extended the *Brady* rule to include "evidence regarding impeachment of witnesses and the government's obligation to produce to the defense impeachment material." *United States v. Walton*, 430 F. App'x 141, 148 (3d Cir. 2011); *see also United States v. Bagley*, 473 U.S. 667, 676 (1985) ("Impeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* rule."). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. Evidence is not suppressed if the Plaintiff could have obtained it "from other sources by exercising reasonable diligence" or "either knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence." *United States v. Perdomo*, 929 F.2d 967, 973 (3d Cir. 1991). Moreover, "[t]he purpose of *Brady* is not to require the prosecution to disclose all possibly favorable evidence to the defense but to make certain that the defendant will not be denied access to evidence which would ensure him a fair trial." *Wilson v. Beard*, 589 F.3d 651, 659 (3d Cir. 2009). However, "[i]t is well settled that prosecutors are entitled to absolute immunity from claims based on their failure to disclose exculpatory evidence, so long as they did so while functioning in their prosecutorial capacity." *Yarris*, 465 F.3d at 137. Regarding the *Brady* obligations of police officers or investigators, those obligations were not clearly established until 1995, when the Supreme Court decided *Kyles v.*

*Whitley*, 514 U.S. 419, 115 S. Ct. 1555 (1995). *See also Gibson v. Superintendent of N.J. Dep't of Law & Pub. Safety*, 411 F.3d 427, 443-44 (3d Cir. 2005).

Plaintiff avers that the Reports revealed the hair tests on the blanket showed that the hair found was "red (like Nick DeTournay) and black (like Barbara DeTournay)", which highly suggests that the blankets wrapping the victims' bodies came from their car and "not from the blond-haired Plaintiff's boat." (*Id.* at ¶ 159). In response, Defendant argues that "this claim stands logic on its head," indicating that just because Thompson testified that the Reports were inconclusive, it does not equate to innocence. (ECF No. 194 at ¶ 5). Moreover, as Defendants stated previously, Plaintiff's trial counsel had the FBI Lab Reports and cross-examined Thompson in reference to the results. (*Id.*; *see supra* Allegation 5).

Plaintiff avers that this allegation relates to Defendant Millard regarding his questioning of Thompson. Mr. Peduto cross-examined Thompson about the reports:

Q. Mr. Thompson, do you have all of your reports that were made with respect to this case in front of you?

A. I have pages 1 through 16 . . . of the report. And I have the report on the fingerprint work and the report on the board.

Q. . . . [D]id your signature appear on any other reports, as far as you know, with this case?

A. Only the submissions to the FBI.

Q. And where are those?

A. I don't have a copy of them.

Q. You mean you don't have a copy of them with you, but –

A. That's correct, sir.

Q. So there are some submissions to the FBI. And how about their response back to you; do you have those?

A. I would not be able to answer for the FBI, so I did not bring those reports.

Q. Well, didn't they, when you submitted something to the FBI, didn't they send you back a report?

A. Those reports were given to the Prosecutor's Office.

Q. Do you have copies of them?

A. I myself do not, sir.

(Ex. B., SA0710; SA0725-0726).

According to Millard, this report was provided to defense counsel for the criminal defendants prior to the 1988 criminal trial as part of the initial discovery package. (*See* Millard's Responses to Second Request for Admission and Second Set of Interrogatories, ECF No. 155-29, at 2). Even further, in Millard's deposition dated March 1, 2017, he testified that the FBI Report was "absolutely" sent to defense counsel, relating to the DNA found at the scene, because he recalled, "they summed up – they opened up – they repeatedly stated to the jury that the report in question – or that there was no forensics, no positives. They know that we submitted the documents to the – to the FBI…" (Dep. Of Millard, ECF No. 155-18, at T25:9-23). Thus, all alleged exculpatory evidence had been produced and disclosed to Plaintiff's trial counsel. Accordingly, no *Brady* violation has been alleged.

<u>Allegation 7</u>:   Defendants Mahony, Churchill and Millard not producing notes of a Jeffrey interview that would have helped Kamienski show he could not have been present at the time of the homicides.

In his supplemental brief, Plaintiff reframes Allegation 7 as follows:

Investigators Churchill and Mahony and Attorney Millard withheld exculpatory investigative notes of an interview of Sidney Jeffrey, III that were created by OCPO Investigator Laurel Hester on or about September 28, 1983. (Ex. 66).

(Pl. Supp. Br., ECF No. 186, at 24). Plaintiff avers that the withholding of Investigator Hester's[5]

notes violates Kamienski's "due process rights to exculpatory evidence in possession of

investigating officers." *Brady v. Maryland*, 373 U.S. 83 (1963); (Pl. Supp. Br. at 29). According

to Plaintiff,

At the time of the trial in 1988, the Ocean County Prosecutor's Office possessed handwritten notes of an initial interview with Jeffrey, which had been conducted and memorialized by Investigator Hester in 1983. Hester's notes indicate that Jeffrey said he and Barbara DeTournay were together at the window in his room at the Holiday Inn and saw the car that Barbara DeTournay was waiting for pull into the hotel parking lot at "exactly 6:15 pm" [double underscored in original]. Hester's notes further indicate that Jeffrey was confident about this because at the time he was "looking at [his] watch."

(Pl. SOF at ¶ 210).

At Kamienski's trial, the report filed by Hester of the interview with Jeffrey was disclosed

to Kamienski; but the investigation notes of Hester were not disclosed.  Hester did not testify at

trial.  Millard called Sidney Jeffrey, III as a witness in the State's case in chief, and used Jeffrey

to testify as to the last time Barbara DeTournay was seen alive.  (ECF No. 169, ¶ 208). According

to Plaintiff, Millard elicited testimony from Jeffrey that Barbara DeTournay arrived "about five

o'clock in the afternoon" at the Holiday Inn where Jeffrey was hiding the three kilos of cocaine

that were to be sold later that evening. (Ex. B, SA1474). Millard also elicited testimony that Jeffrey

---

[5] Laurel Hester has died since the time of the investigation.

watched Barbara DeTournay leave the Holiday Inn with the drugs and enter a car with one of the participants in the drug deal. (*Id.* at SA1477-1480). Millard never questioned Jeffrey about the time when he saw Barbara DeTournay enter the car. (ECF No. 169 ¶ 209).

Plaintiff argues that had these notes been made available to him, he would have known when Barbara DeTournay was last seen alive because, according to these notes, Jeffrey was standing with her in a bedroom at the Toms River Holiday Inn and looking at his watch at the time, which showed 6:15 p.m., "exactly." (Pl. supp. Br. at 24-25). According to Plaintiff, without these interview notes, his trial counsel

> was not aware of, and thus not able to pin down, the precise time when Barbara DeTournay was last seen still alive by a witness, and, thus, defense counsel was unable to show Barbara could not have been already murdered and stowed in Alongi's boat in his back yard at around 6:45 p.m., which is when Duckworth claims she and Kamienski arrived at Alongi's house and saw the bodies.

(*Id.*)

In response, Defendants argue that Plaintiff's trial counsel never requested any of the notes used to formulate reports. (Def. Rep., ECF No. 194, at 4). According to Defendants, though Kamienski asserts that he did not have information that Barbara DeTournay was picked up at 6:15 p.m. and the time was misrepresented to be 6:00 p.m., this central allegation by Kamienski is completely untrue because Mahony submitted affidavits in support for search warrants which disclose same. It states:

> On Sunday, September 18, 1983, the victims visited Sidney Jeffrey at the Holiday Inn. They advised Jeffrey that the deal was being delayed until Monday, September 19, 1983, as the purchasers would not be able to assemble the necessary cash until that time. On Monday afternoon, September 19, 1983, Barbara DeTournay arrived at the Holiday Inn, Toms River, and went to the room of Sidney Jeffrey. She advised him that the transaction was under way and that Henry N. DeTournay was at the time meeting with the people who were going to purchase the cocaine. She further advised that if all went well, she would be picked up outside the lobby door of the Holiday Inn at 6:15 P.M. and transported to the meeting place to deliver the cocaine. At approximately 6:15 P.M., Barbara DeTournay looked out of the window and informed Jeffrey that the car which was to transport her to the meeting place was

downstairs. She took the cocaine, placed it in a shoulder-type carrying bag and left. Sidney Jeffrey never saw her again, and when he didn't hear from her or Henry N. DeTournay by the next day, he became nervous and returned to Florida.

(Affidavits of Mahony, Oct. 5, 1983, Oct. 21, 1983, and Feb. 21, 1984, ECF Nos. 194-1 to 194-3, at ¶ 15). Based on the above affidavits, defense argues that Plaintiff's counsel should have known when Barbara DeTournay was last seen alive. Moreover, Jeffrey testified at trial, and Plaintiff's counsel had opportunity to cross-examine him on the time that he last saw Barbara DeTournay alive. There is no cited reference by Plaintiff that Plaintiff's trial counsel sought to clarify this fact at trial.

Second, regarding whether the failure to turn over these allegedly exculpatory investigator notes violated *Brady*, no such due process right existed at the time of the investigation (1983-1989). Plaintiff primarily relies on *State v. Dabas*, 215 N.J. 114 (2013) and *State v. W.B.*, 205 N.J. 588 (2011) to support the proposition that "rough witness notes must be maintained so that they can be made available to the defense for use at trial" and that defendants failure to maintain these notes, and withholding of these potentially exculpatory notes violated his due process. (Pl. Supp. Br., ECF No. 186, at 24).

More specifically, in 2004, the New Jersey Supreme Court first expressed disapproval of law enforcement officer's destruction of notes from interrogation sessions, explaining it is "a practice that is apparently common, but one that we disapprove of." *State v. Cook*, 179 N.J. 533, 542 n.3, 847 A.2d 530, 535 (2004). Since then, in 2011, the New Jersey Supreme Court relied on New Jersey Court Rule 3:13-3(b), which provides for pre-indictment discovery, and held that "law enforcement officers may not destroy contemporaneous notes of interviews and observations at the scene of a crime after producing their final reports." *W.B.*, 205 N.J. at 607. The Supreme Court

provided a thirty-day period "to allow prosecutors sufficient time to educate police officers accordingly." *W.B.*, 205 N.J. at 608-09.

The court in *Zisa v. Haviland*, No. 17-5551, 2018 U.S. Dist. LEXIS 180823, at *51-52 (D.N.J. Oct. 19, 2018) recently had the opportunity to confront a similar issue regarding destruction of interview notes, and in determining that the preservation of interview notes was not a clearly established right, explained

> *W.B.* is not a decision of from the United States Supreme Court and does not interpret the United States Constitution. Therefore, it does not reflect a federal constitutional right. In addition, it does not appear that *W.B.*, or the cases to which it cites, relied on any New Jersey constitutional provisions in determining that law enforcement officers must preserve notes. Instead, the New Jersey Supreme Court ruled that the preservation was required pursuant to the New Jersey Rules of Court. *Id.* at 608-09. Thus, the preservation of notes does not even appear to be a New Jersey constitutional mandate. While not raised by Plaintiff, the Court also notes that in the Third Circuit, federal agents as well as state or municipal officers working with federal agents on a federal investigation are required to preserve their rough notes from interviews with prospective trial witnesses. *See United States v. Vella*, 562 F.2d 275, 275-76 (3d Cir. 1977). *Vella*, however, does not apply to state, county, or municipal officers' conduct in the course of a state, county, or municipal investigation.

*Zisa v. Haviland*, No. 17-5551, 2018 U.S. Dist. LEXIS 180823, at *51-52 (D.N.J. Oct. 19, 2018).

Here, at the time of the investigation (1983 to 1988) and trial (1988), there was no clearly established right to maintain interview notes, or to produce such interview notes. Accordingly, Churchill, Mahony, and Millard are entitled to qualified immunity.

**Allegation 8**: Not producing notes of a Lehman interview that would have shown that Lehman gave false testimony when he said he had not been cooperating with authorities on the Kamienski investigation, and when Lehman said that Kamienski told him about two bodies being found when only one had been recovered at the time.

Plaintiff reframes this issue in his supplemental brief, arguing that his due process rights were violated when Churchill, Mahoney, and Millard withheld exculpatory notes of Investigator Hester of an interview with Arthur (Buddy) Lehman. (Pl. Supp. Br., ECF No. 186, at 26). Plaintiff argues that the trial testimony of Lehman was significant in that Lehman testified that he had spoken with Plaintiff in person after Nick DeTournay's body had been discovered, but before Barbara DeTournay's body had been recovered. (Pl. Supp. Br. at 27). According to Plaintiff, "Lehman further testified that during this meeting Kamienski told him that both of the DeTournays ('my friends,' plural) had been killed and disposed of in the Barnegat Bay." (Pl. SOF at ¶ 196, SA2692). According to Plaintiff, this testimony was false, because Hester's interview notes reflect that Lehman and Plaintiff spoke on the phone, not in person, and only after both bodies had been recovered by the OCPO. (*Id.* at 198). From Lehman's trial testimony, Plaintiff argues that the Prosecution was inferring to the jury that Kamienski was present at the murders because he knew both victims had been killed. (ECF No. 169, ¶¶ 196, 198).

Hester's interview notes reflect the following:

CALLED COUPLE DAYS AGO
RET. CALL.
AVOID MEN
PAUL CALLED AFTER BODIES FOUND → PK STAYING AT H.I
"REMEMBER THOSE PEOPLE N+B IN FLA.
FOUND IN BAY"

(Notes of Laurel Hester, ECF No. 192-5).

In response, Defendants argue that all of Hester's reports were provided to the defense, and no request was ever made for her interview notes. (Def. rep., ECF No. 194, at 5). Moreover, though Hester was available, the defense did not call her as a witness. (*Id.*)

For the same reasons as previously expressed, there was no clearly established right to maintain interview notes, or to produce such interview notes at the time of the investigation (1983 to 1988) and trial (1988). *See Zisa*, No. 2018 U.S. Dist. LEXIS 180823, at *51-52. Accordingly, Churchill, Mahony, and Millard are entitled to qualified immunity.

<u>Allegation 9</u>:  Not producing a memorandum of a confidential informant interview that would have shown Lehman gave false testimony when he said he was not a paid informant for law enforcement.

Plaintiff reframes this issue in his supplemental brief, arguing "Investigators Churchill and Mahony and Attorney Millard withheld an exculpatory investigative memorandum (final version, not draft or handwritten) of an interview of a confidential informant by Investigator Laurel Hester, which memo was created and filed on April 28, 1986. (Ex.64). The memo specifically references setting up a follow up meeting between the confidential informant and Churchill." (Pl. Supp. Br., ECF No. 186, at 27). According to Plaintiff, Buddy Lehman was a confidential informant and Millard, Churchill, and Mahony failed to disclose this key witness's status as a confidential informant during the underlying criminal trial, and affirmatively and repeatedly misled the criminal trial judge and Plaintiff's trial counsel about the Lehman's status as a confidential informant ("CI") in violation of *Giglio*. (Pl. Third Supp. Br., at 1).

On June 7, 2013, Plaintiff filed motion to compel discovery in this matter. (ECF No. 72-15, at 8). Plaintiff states that as a result of that motion, the OCPO produced a memorandum of an interview that had been produced to defense counsel. (Pl. Third Supp. Br., at 3). Plaintiff relies primarily on this memorandum captioned "Debriefing of CI 85-13," dated March 15, 1985, and is addressed to Prosecutor Turnbach from Investigator Hester. (Confidential Informant ("CI") Memo., Mar. 15, 1984, ECF No. 192-4). Plaintiff contends CI 85-13 is Buddy Lehman, but the memo does not identify Lehman as the CI. The memo states that, following the CI's arrest on March 12, 1985, the CI has agreed to "cooperate jointly with the New Jersey State Police and the Ocean County Prosecutor's Office." (*Id.*) The memo then discusses the DeTournay homicide:

CI 85-13 stated that following the De Tournay homicide, Anthony Alongi
(if) had large blocks of rock quality cocaine for sale.  Alongi's part-
ners involved in the distribution of the cocaine were identified as
Stu Siegel (if), and Joseph Marzeno (if), known to the informant as
Michael Testa (if).  CI 85-13 stated that Alongi frequented Atlantic
City after the homicide, and that it was in a hotel room at Harrah's
or Caesar's, where he observed the cocaine on the bed.  A buyer of large
amounts of cocaine from Alongi during this period of time was identified
as Roger Munson (if).  It should be noted that Munson's name and tele-
phone number was found in Alongi's books seized during the execution of
a search warrant in February of 1984.  Another location where cocaine
was distributed following the homicide, was at Island Heights Condominium
where Joseph Marzeno was staying.  According to the CI, Marzeno had
half pound blocks of cocaine, and carried a 38 revolver.

It should be noted that Marzeno had been identified previously by a
New Jersey State Police informant was conducting  illegal business with
Alongi at a "safe house" located at 1895 Monitor Drive, Toms River.  The
bayfront house, owned by Joseph Iannuzzi, a politician from Newark, was
the scene of a search warrant execution on October 29, 1984.  At that
time, the house was observed to be gutted.

(*Id.* at 2). It also discusses the CI's contacts with Plaintiff Alongi:

CI 85-13 was also questioned regarding a threatening type phone call
made by Alongi to Kaminski.  The CI stated he had met Alongi at a restaura
at which time Alongi stated he felt Kaminski was avoiding him.  At that
point, the CI made the call to Kaminski in Florida on Alongi's behalf.

CI 85-13 further states that subsequent to Alongi's arrest by DEA, approx:
mately two months after the DeTournay homicide, Alongi had bragged to
the CI that he had a substantial quantity of cocaine in his house, con-
sealed in a video cassette recorder.

Presently, CI 85-13 is re-establishing contact with Anthony Alongi, who
is believed to be presently distributing cocaine, as well as bookmaking
with an unknown subject.  Also, it was reported that Alongi's present
girlfriend, in addition to Jackie Sullivan, is Joni Wilbert.

According to CI 85-13, Alongi is hanging out at Bobby G's, the restaurant
bar at Bey-Lea Golf Course.  The undersigned learned from a reliable
source that Roger Munson plays in a band at Bobby G's.

(*Id.* at 3). According to Plaintiff, "[t]here are just too many coincidences to reasonably conclude

otherwise" that Lehman was a CI. (Pl. Third Supp. Br. at 3). In further support, Plaintiff points to

his own declaration. (*Id.*) In his declaration, Plaintiff claims that on October 28, 1985, Mahony

conducted a search of his boat, pursuant to a search warrant to look for "illegal drugs/pills." (Pl.

Decl., ECF No. 192-2, at ¶ 2). During the search, Duckworth turned over 100 pills that Plaintiff

believed to have been Quaaludes, but were instead Valium. (*Id.* at ¶ 5-6). After this, Plaintiff and

Duckworth were arrested, and the boat was seized. (*Id.* at 7). Plaintiff essentially claims that he

had been "set up by a person or persons acting under the influence of someone at the OCPO, and that the entire pill episode was related to the DeTournay murder investigation." (*Id.* at ¶ 9). Plaintiff believes that it was Lehman who set him up, as the day before his arrest, Lehman had arranged for Plaintiff to meet with a woman named Terri, to obtain 100 Quaalude pills. (*Id.* at ¶ 10). According to Plaintiff, Lehman was present during the transaction, and because Plaintiff did not have the money to pay for the pills, Lehman paid, with the understanding that Plaintiff would repay Lehman at a later date. (*Id.*) According to Plaintiff, he learned at trial that Lehman was arrested on March 12, 1985, for possession of cocaine. (*Id.* at ¶ 11). This is the same date that the CI identified in the Debriefing of CI 85-13 memo, dated March 15, 1985, was arrested.

Plaintiff also points to an additional C.I. Debriefing memo, from Hester to Prosecutor Turnbach, dated April 28, 1986, of another CI (whose identity is unknown to this Court), which reported

```
Prior to the interview taking place, the source had indicated
to the F.B.I. that he could identify a subject whom he believes
knows about the DeTournay homicide and how that individual could
be induced to cooperate.  He identified this subject as being
----ARTHUR--"BUDDY" LEHMAN (if).  Lehman has been interview previously
concerning his knowledge of the homicide.  It should be emphasized
that the source is in need of assistance and may be professing to
know more that he does or may be holding back information in
order to grandstand at a more opportune time.
```

(CI Memo, April 28, 1986, ECF No. 192-6). The CI further discusses his contacts with Lehman, and the memo states that "Lehman has implied to the source that he is a paid informant." (*Id.* at 3).

Defendant insists whether Lehman was "an informant is speculative . . ." and "he was definitively not an informant for the OCPO." (ECF No. 194, at 10); and furthers there is no evidence that Lehman was an informant. (Def. Third repl br., ECF No. 205, at 9). According to Defendants, Lehman testified that his arrest could have been either March 12, 1985 or March 15, 1985, and

that he was arrested by the Monmouth County Prosecutor's Office, not the OCPO. (*Id.*) Moreover, Defendants argue "[t]here would have been no connection between Lehman and the DeTournay's murders such that [Monmouth County] would have reached out to the OCPO to arrange a meeting." (*Id.*)

At trial, Lehman testified on cross-examination that he was not a police informant, but that he "gave some information to the Prosecutor's Office on this case." (Ex. B, Sa2741). The following exchange also occurred: "Q. [Y]ou never were a paid informant for the Ocean County Prosecutor's Office? A. No, sir. No, sir." (Ex. B, Sa2742).

First, it is important to note that Laurel Hester has died, and the documents Plaintiff alleges are attributed to Hester are subject to an authentication argument. Moreover, based on the evidence in the record, it is not clear whether Lehman was a confidential informant. That is, without corroboration that Lehman was the CI, the allegation is speculative at best. There is nothing within that memo that clearly identifies Lehman as CI 85-13. The CI memo dated April 28, 1986 of the unknown CI specifically alleged that Lehman had told the unidentified informant that Lehman was a CI. (*See* CI Memo, April 28, 1986, ECF No. 192-6, at 3). In such an instance, the Supreme Court, in *Giglio*, has extended the *Brady* rule to include "evidence regarding impeachment of witnesses and the government's obligation to produce to the defense impeachment material." *Walton*, 430 F. App'x at 148; *see also Giglio*, 405 U.S. at 154-55. During this case, Plaintiff never explored the issue of either the unknown confidential informant or persons other than Hester who may have knowledge of it during the discovery period.

However, while this may be a *Brady* violation, "[i]t is well settled that prosecutors are entitled to absolute immunity from claims based on their failure to disclose exculpatory evidence, so long as they did so while functioning in their prosecutorial capacity." *Yarris*, 465 F.3d at 137.

Regarding the *Brady* obligations of police officers or investigators, those obligations were not clearly established until 1995 in the Supreme Court's decision in *Kyles v. Whitley*, 514 U.S. 419, 115 S. Ct. 1555 (1995); *see also Gibson v. Superintendent of N.J. Dep't of Law & Pub. Safety*, 411 F.3d 427, 443-44 (3d Cir. 2005). Accordingly, Millard is entitled to prosecutorial immunity and Mahony and Churchill are entitled to qualified immunity.

Allegation 10: Not producing an interview memorandum of a boat part supplier and notes of an interview of a boatyard worker that would have shown Kamienski pulled his boat out of the Barnegat Bay for legitimate, pre-arranged repairs and not to hide his involvement in the homicides.

Plaintiff reframes the allegation in his supplemental brief so it reflects the defendants who violated the alleged right:

> Investigators Churchill and Mahony and Attorney Millard withheld an exculpatory investigative memorandum dated November 3, 1983 of an interview taking place on September 29, 1983 of a boating supplier employee, which memorandum was created by Investigator Edward Murphy for Defendant Churchill's attention, as well as a handwritten draft of a similar memorandum from Investigator Hester for Churchill's attention, dated October 24, 1983, reflecting her interview of a boat yard employee. (Ex. 79 and OCPO-0241-43).

(Pl. Supp. Br., ECF No. 186, at 28). In weighing this allegation, the Court reviewed a section of the statement of facts captioned "Kamienski Boat Repair." (ECF No. 158 at 55-56). Plaintiff argues that Mahony "deliberately withheld both sets of interview notes of the supplier and worker (DeRouville) from the defense." (*Id.*) Plaintiff frames the withholding as a violation of Kamienski's due process right to exculpatory evidence. According to Plaintiff, the disclosure of these notes would have essentially rebutted Millard's closing argument declaring that Kamienski pulled his boat from the bay in an effort to hide his personal involvement in the murders; when, instead, the OCPO had actually received statements from a yacht parts supplier and the boatyard worker stating that the boat had been previously scheduled for removal for repair. Conversely, Defendants argue this claim as nonsensical because: (1) Kamienski testified and failed to explain the rationale behind the removal of his boat; (2) Kamienski's trial counsel never conducted any investigation regarding the boat; (3) Mahoney's supplemental report, dated November 4, 1983, referenced that the boat (For Play 111) was in for repairs; and (4) Kamienski

had knowledge of the investigative work because he signed a consent to search his boat. (ECF No. 194 at 10; *See also* Ex. D, Supp. Investigation Rep., Ex. D, ECF No. 194-4, at 3).

Based on the record before the Court, the identities of the boat part supplier and boatyard worker are unknown, as well as which investigator interviewed these individuals, or whether these individuals testified as witnesses during the trial. However, during closing statements at trial, Millard referenced Kamienski's boat being removed from the boatyard:

> . . . Ten-thirty the night of the nineteenth the deal went down . . . The twentieth Paul Kamienski's boat is hauled out of the water or is taken to the Toms River Boat Works. Mr. Kamienski told us that, he admitted that on the stand. You look at that, the twentieth, its right on top of the nineteen. But that's not the boat that Donna Duckworth saw the bodies in. I did not put any witnesses that it was any boat other than the boat in Tony Alongi's yard. That's another reason, that he got his boat out of the water, because he knew what happened. He knew those bodies were dumped out in the bay and he was going to get his boat out of the water just as fast as possible because he didn't know if those bodies were going to be found or not, or whether they were going to be found, if they were found at some point, maybe they didn't know exactly what day, they were in the water, and he'd be able to say, hey, look at it, don't talk to me, my boat was out of the water.

(Ex. B, SA4327-4328).

As discussed in Allegation 7, *supra*, the Court in *Zisa* clarified that the preservation of interview notes was not a clearly established right at the time of the investigation. *Zisa*, No. 2018 U.S. Dist. LEXIS 180823, at *51-52. At the time, note-preservation, in particular, has been construed as neither a federal *nor* state constitutional mandate. *Id.* (emphasis added). Importantly, Millard was acting as an advocate delivering his argument. As such, Millard has absolute immunity. (ECF No. 158 at 37-38). Millard was the "sole prosecutor who tried the case" and was responsible for selecting witnesses, physical evidence, and conducting both the opening and closing. (*See*, law on prosecutorial immunity, Section III, pp. 5-10). Prosecutors may successfully invoke the

protection of absolute immunity when their conduct was "intimately associated with the judicial [process]"—which, of course, includes activity conducted while in court—despite failing to turn over exculpatory materials. *Imbler*, 424 U.S. at 430.

However, Churchill and Mahony are not attorneys, and their function as investigators is subject to qualified immunity. Kamienski did not seek the production of Defendants' investigative notes. (ECF No. 194 at 12). As noted above, qualified immunity is warranted where the investigative conduct did not amount to a violation of a clearly established right. With respect to the actual withholding, such concealment will only give rise to violation of a clearly established right if "[Plaintiff], in the exercise of diligence, could not have discovered [the] evidence himself." *Munchinski v. Solomon*, 747 F. App'x 52, 61-62 (3d Cir. 2018). Here, at the time of the investigation (1983 to 1988) and trial (1988), there was no clearly established right to maintain interview notes, or to produce such interview notes. *Zisa*, 2018 U.S. Dist. LEXIS 180823, at *51-52. Moreover, Kamienski signed a consent to search his boat, (Ex. D, Supp. Investigation Rep., Ex. D, ECF No. 194-4, at 3), and was privy to, the investigative work being performed by Churchill and Mahoney, and could have pursued a production of the interview notes, but he failed to do so.

In sum, the motion is denied because Mahoney and Churchill are subject to qualified immunity. That is, they did not violate any clearly established right at the time of the subject conduct, *State v. Cook*, 179 N.J. 533, 542 n.3, 847 A.2d 530, 535 (2004), and Millard is subject to prosecutorial immunity.

<u>Allegation 11</u>: Defendant Mahony creating a false memorandum of interview with Duckworth saying that the towel and blankets recovered with the victims were "identical" to or the "same" as ones from Kamienski's boat and that a knot on the clothesline around one of the bodies was "unique" to Kamienski. When, in fact, as Duckworth told Mahony (and later Millard) she could not say the items were the same as ones on Kamienski's boat, only similar, and she could not say the knot was unique to him. The effect of this false memorandum was to pressurize Duckworth into giving false testimony as to these issues --testimony that she subsequently retracted.

Plaintiff reframes the Allegation in his supplemental brief as:

In a September 18, 1987 witness interview memorandum, Investigator Mahony fabricated statements by Duckworth saying that she said she could positively identify the suspect blanket and towel recovered with the DeTournays' bodies as belonging to Kamienski and further she could confirm that the knot on the rope around Nick's body has been tied by Kamienski. The word Mahony ascribed in his report to Duckworth for the blankets and towel was "identical," and the word he said she used for the knot was "unique." (Ex. 47) (ECF No. 186, at 28).

Plaintiff asserts that the alleged statements within the subject memorandum were "fabricated," and, as such, violated Plaintiff's "due process right to a fair trial, and to not have investigative officers create false or tainted statements of evidence in possession of investigating officers or prosecutors." *Napue v. Illinois*, 360 U.S. 264, 269 (1959); (ECF No. 186 at 29-30). Defendants assert that Duckworth provided eyewitness testimony regarding Kamienski's involvement in a drug conspiracy, and Mahony's report "speaks for itself." (ECF No. 166, ¶¶ 178-79). However, Plaintiff alleges, "Duckworth repeatedly told Mahony that the towel and blankets were 'similar' to, or 'like' ones she had seen on Kamienski's boat; but she never stated that they were identical." (ECF No. 158 at ¶ 287). Plaintiff argues that "a jury could infer that Mahony created this false memorandum to coerce Duckworth into giving similar false testimony at trial" or "it conveyed to the defense" that Duckworth's testimony "was stronger than it really was." (ECF No. 186 at 30). This was an essential issue during discovery. So, it was exposed at Mahoney's deposition. The deposition states:

Q. What did she say?

A. She said that similar towels were used.

 Q. She never said that's identical towel?

A. Never.

Q. She never said that's the identical blanket.

A. Not to me.

Q. Not to you?

A. Not to me.

    . . .

 Q. She said they were identical?

A. They were similar.

Q. Did she say they were identical?

A. She could've.

(Dep. of Mahony, Ex. D, T131:2-9).

As noted with regard to prior allegations, a constitutional due process violation cannot be triggered by way of negligence. *Daniels*, 474 U.S. at 328. The misuse of the word "identical" instead of "similar" connotes a minor negligent statement (at most). "[A] clearly established right is one that is '*sufficiently clear* that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix*, 136 S. Ct. at 308 (emphasis added).

This allegation relates solely to Mahony in an investigative capacity. Whether Mahony used the words "identical" or "the same" or "similar" in describing the blanket and towel in the report, it appears that he was characterizing Duckworth's representation. There is no proof of an intentional misstatement. Plaintiff argues that the jury could "infer" a fraudulent interest, however, he has not shown any facts that cold support such an inference. The Plaintiff has not submitted

any case law that supports the proposition that the use of "identical" or "same," or that misuse of such a word in an investigative memo constitutes a violation of the due process clause. As such, it cannot be established that Mahony was acting in violation of a specific due process right. Accordingly, qualified immunity appropriately bars this claim. (See, law on qualified immunity, section IV, pp. 10-11).

Allegation 12:  Defendant Mahony not providing in this action the substance of the probable cause used to obtain a search of Kamienski's boat --a search that led to the filing of charges against Duckworth and later her cooperation against Kamienski while her sentencing and potential admission into the PTI program were hanging over her head.

Plaintiff reframes this allegation in his supplemental brief as:

> Investigator Mahony cannot establish probable cause for the search of Kamienski's boat in 1985 that led to Duckworth's arrest and conviction for drug possession, and which, a reasonable juror could later be influenced by her decision to cooperate with the OCPO against Kamienski.

(Pl. Supp. Br., ECF No. 186, at 30). This argument is difficult to understand, but, as best as the Court can comprehend it, it is as follows:

Plaintiff argues that Mahony's failure to recall the substance of the probable cause that was set forth within the affidavit to obtain a search warrant for Plaintiff's boat sparked a string of unlikely events including the cooperation of Duckworth to testify against Kamienski. (ECF No. 158 at 41). Specifically, Plaintiff states that Kamienski's "due process right to not have investigative officers coerce cooperating witnesses to give false testimony" was violated. *Hysler v. Florida*, 315 U.S. 411, 413 (1942); (ECF No. 186, p. 34-35).

This argument was previously addressed by Judge Stanley Chesler, U.S.D.J. Judge Chesler rejected Plaintiff's probable cause argument, as Kamienski "could not muster a scintilla of evidence," and the ruling was not challenged before the Third Circuit. (ECF No. 194 at 12). The Third Circuit has shaped its preclusion doctrine such that, following a final judgment, the same acts, witnesses, and documentation which were at controversy in a prior proceeding are barred from future litigation. *Davis v. U.S. Steel Supply*, 688 F.2d 166, 171 (3d Cir. 1982). Because this issue is intimately linked to one having already been decided (the nature of Duckworth's perjured testimony), and it would require all of the same persons and materials to re-attempt proving the

allegation, this issue is precluded; in addition, there is an absence of material fact in the present docket to support Plaintiff's contention.

<u>Allegation 13</u>:   Defendants Mahony, Churchill and Millard, pressuring Duckworth into testifying that Kamienski had, in effect, admitted to being at the scene of the murders when they occurred, which is also testimony that Duckworth has since retracted.

Plaintiff's counsel reframes the allegation:

> One can reasonable (*sic*) infer Investigators Churchill and Mahony and Attorney *cum* Investigator Millard pressured Duckworth (1) to give false testimony against Kamienski, particularly as to his possible ownership of the blankets and towel found with the DeTournays' bodies (2) the possibility that he tied the rope around Nick's body and (3) certain events that occurred on the night the DeTournays were killed concerning her supposed trip Bamberger's (which later obtained credit card records show occurred a week before the murders, not the night of (4) the trial transcript itself shows Duckworth's reluctance to say things like, "I recognize the knot and can confirm it was tied by Kamienski." One can almost feel Millard having to drag this kind of testimony out of a very reluctant Duckworth. The same thing can be gleaned with respect to the blankets and towel. And this dynamic occurred both at trial and before the grand jury.

(Pl. Supp. Br., ECF No. 186, at 31). In response, Defendants argue that Duckworth has never retracted her trial testimony. (Def. Supp. Br., ECF No. 194, at 7).

Plaintiff's allegations regarding Duckworth's testimony are as follows. At trial, Millard elicited testimony from Duckworth that on the night of the murders she was sent by Kamienski and his co-defendants to a Bamberger's department store (by implication, to allow Kamienski and his co-defendants time to dispose of the bodies clandestinely). (Pl. SOF, ECF No. 158, ¶ 169). According to Plaintiff, Duckworth made a purchase at Bamberger's on September 13, 1983 and not September 19, 1983, as she had testified at trial. (*Id.* at ¶ 170). Plaintiff provided documentation concerning the correct date of purchase in his habeas action. (*Id.*; Ex. D, P22, P23). Duckworth testified that she cannot remember whether the OCPO's investigators (Defendants Churchill and Mahony) ever confirmed the exact date of her trip to Bamberger's. (Dep. Of Duckworth, Ex. E, ECF No. 194-5; T95:2-7; *see* Pl. SOF, ECF No. 158 at ¶ 171).

The use of the term "pressuring Duckworth" was not adequately explained in Plaintiff's statement of facts, nor has Plaintiff cited to the record, so it is difficult to determine what facts constitute "pressuring."

However, in the reframed allegation, Plaintiff's attorney refers to Millard questioning Duckworth and he concludes "one can almost feel Millard having to drag this kind of testimony out of a very reluctant Duckworth . . . and this dynamic occurred both at trial and before the grand jury." (Pl. Supp. Br., ECF No. 186, at 31).

Without citing to the record, Plaintiff states that Duckworth retracted her testimony regarding the towels and blankets found with the DeTournays' bodies, the clothesline knot she stated was "unique" to Kamienski, and Kamienski's being at the scene of the murders. (Pl. Sec. Supp. Br., ECF No. 186, at ¶¶ 11, 13). Defendants discount Plaintiff's argument by noting that Duckworth never retracted her trial testimony. (Def. Sec. Supp. Br., ECF No. 194, at 7).

Churchill and Mahoney are entitled to qualified immunity regarding this allegation. Plaintiff argues that "pressuring" is shown by the facts set forth in the reframed allegation, and that this conduct violated Kamienski's due process right "where false testimony is used to obtain a conviction." (Pl. Sec. Supp. Br., ECF No. 186, at ¶ 13). Freedom from conviction based on false testimony obtained from a "pressured" witness is a clearly established constitutional right. *Hysler v. Florida*, 315 U.S. 411, 413 (1942). In *Hysler*, the Court stated:

> If a state, whether by the active conduct or the connivance of the prosecution, obtains a conviction through the use of perjured testimony, it violates civilized standards for the trial of guilt or innocence and thereby deprives an accused of liberty without due process of law. Equally offensive to the Constitutional guarantees of liberty are confessions wrung from an accused by overpowering his will, whether through physical violence or the more subtle forms of coercion commonly known as 'the third degree.'

*Id.*

Here, there is a lack of facts to demonstrate that Churchill or Mahoney "pressured" Duckworth into giving any false testimony. There is little or no evidence in the record that Duckworth "retracted" all of her testimony. In fact, in her deposition, when asked "is it possible you made a mistake at the trial," Duckworth replied "no". (Dep. Of Duckworth, Ex. E, ECF No. 194-5, at T116:20-25). Even if Duckworth's testimony regarding Bamberger's was knowingly false, there is nothing in the facts to indicate that Duckworth was under any pressure from Churchill or Mahoney to testify falsely, and both have testified that they did not believe Duckworth testified untruthfully. (Churchill Resp. to Req. for Admiss., Ex. W, ECF No. 194-23; Mahoney Resp. to Req. for Admiss., Ex. Z, ECF No. 194-26; *see* Def. Sec. Supp. Br., ECF No. 194, at 11).

Because the facts Plaintiff has alleged are insufficient to show a violation of a clearly established constitutional right, Defendants Churchill and Mahoney are entitled to qualified immunity. *See Walker*, 905 F.3d at 144; *Saucier*, 533 U.S. at 201. Defendant Millard is entitled to absolute prosecutorial immunity because all of the allegations refer to her questioning of her during trial. As such, he was acting as an advocate and was "intimately associated with the judicial phase of the criminal process." *Imbler*, 424 U.S. at 430.

Allegation 14:    Defendant Millard vouching for witnesses during closing argument (particularly Duckworth and Lehman). Misstating testimony and evidence, such as twice saying, one of the codefendants had told Duckworth Kamienski was as involved in the murders as the other guys. Sending charges to a jury for conspiracy to commit murder when he knew it was not supported by the evidence. And, misleading the jury into thinking murder was a continuing crime that continued after the fatal bullet.

Plaintiff reframes the allegation in his supplemental brief as follows:

> Attorney Milliard's improper closing in which he personally vouched for Duckworth and Lehman's credibility; sent a conspiracy charge to the jury after acknowledging there was no factual basis for it; and misstated that murder is a continuing offense and Kamienski could be found guilty of murder if he helped get rid of the bodies afterwards, even if he had no knowledge beforehand and did nothing at the time of the murders to help commit them.

(Pl. Sec. Br, ECF No. 186, at 32). Plaintiff argues that these alleged misstatements violated his "due process right to a fair trial, untainted by false or misleading information being presented to the jury." (*Id.*). Plaintiff acknowledges absolute immunity may ordinarily control except that Millard's conduct was so far beyond the pale of what is expected of an aggressive, but fair, prosecutor, that absolute immunity does not apply. (*Id.*).

Plaintiff cites to some facts to support his contention. First, Plaintiff argues that Millard "vouched" for the truthfulness of Duckworth's and Lehman's testimonies. (*Id.*). With respect to Duckworth, Millard stated the following:

> I'm telling you that is an eyewitness account of what occurred. (Ex. B., Tr. Of Criminal Tr., at T276:3-4).

> She's not out to get anybody. She's telling the truth. You saw Donna Duckworth on that stand for about two days, and I submit she poured her heart out here. She was gone over by three defense attorneys every conceivable way and manner in which somebody can be gone over, and I submit to you that her testimony was credible, it was the truth. (*Id.* at T292:2-10).

Plaintiff argues that Millard also "vouched" for the truthfulness of Lehman's testimony by saying that Lehman was "forthright" and "wasn't hiding anything." (Ex. B., Tr. Of Criminal Tr., at T243:21-22, T244:5; Pl. SOF, ECF No. 158, ¶ 217).

Second, Plaintiff contends that on two occasions during his closing, Millard told the jury that Duckworth testified that Alongi told her Kamienski was involved in the murders, when there was no such testimony. (Pl. SOF, ECF No. 158, ¶ 219). Defendant denies this allegation. (Def. SOF, ECF No. 166, ¶ 219).

Third, Plaintiff contends that Millard told the jury that Kamienski removed his boat from the Barneget Bay to shield his involvement in the DeTournay murders, and the Court corrected same. (Pl. SOF, ECF No. 158, ¶ 219). Millard stated:

> The twentieth. Paul Kamienski's boat is hauled out of the water or is taken to the Toms River Boat Works You look at that, the twentieth, it's right on top of the nineteenth. But that's not the boat that Donna Duckworth saw the bodies in. I did not put any witnesses that it was any boat other than the boat in Tony Alongi's yard. That's another reason that he got his boat out of the water, because he knew what happened. He knew those bodies were dumped out in the bay and he was going to get his boat out of the water just as fast as possible because he didn't know if those bodies were going to be found or not, or whether they were going to be found, if they were found at some point, maybe they didn't know exactly what day, they were in the water, and he'd be able to say, hey, look at it, don't talk to me, my boat was out of the water.
>
> MR. CAMMARATA: I object to all of these comments.
>
> THE COURT: Ladies and gentlemen, there is no testimony about any of that.

(Ex. B., Tr. of Criminal Tr., at T278:20-279:21).

Fourth, Plaintiff argues that Millard's comments were outrageous because the OCPO investigators had statements from a yacht parts supplier and the boatyard saying that Plaintiff took

his boat out of the water as part of scheduled repair. (Pl. SOF, ECF No. 158, ¶ 220; Dep. of Churchill, Ex. U, ECF No. 194-21, T51:20-23 and 53:9-54:2).

Fifth, Plaintiff argues that Millard conceded that Kamienski had no prior knowledge of the murders, but Millard "submitted the murder conspiracy charge to the jury." (Pl. SOF, ECF No. 158, ¶ 221, 223). More specifically, Millard closed:

> And I'm going to say does Paul Kamienski necessarily know that they're going to get killed? I don't think so. Not from the evidence and the testimony that I've heard.

(Ex. B., Tr. Of Criminal Tr., at T276:15-19).

Even if some constitutional right were implicated, Defendant Millard is entitled to absolute immunity for all the preceding claims. There is no exception to absolute immunity for conduct "so far beyond the pale of what is expected of an aggressive, but fair, prosecutor." (Pl. Sec. Supp. Br., ECF No. 186, at 32). Absolute immunity "protects a prosecutor from § 1983 liability for virtually all acts, regardless of motivation, associated with his function as an advocate." *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994) (explaining that absolute immunity covers even conspiracy to present false evidence at trial, even though "such a conspiracy is certainly not something that is *properly* within the role of a prosecutor"). Instead, the functional test applies, and what matters is the nature of the function performed rather than the way it was performed. *Buckley*, 509 U.S. at 269. Defendant Millard's conduct described above was "intimately associated with the judicial phase of the criminal process," because each of the above actions are acts he took while he was acting as an advocate for the state during trial, i.e., statements he gave during his closing summations. *Imbler*, 424 U.S. at 430. As such, for these acts, Millard is protected by prosecutorial immunity.

<u>Allegation 16</u>:  Defendants Kelaher, Lynch Ford, DeLigny and Marzarella not conducting any investigation (or any meaningful investigation) after Kamienski notified the Ocean County Prosecutor's Office and New Jersey Attorney  General that Duckworth had given false testimony concerning the towel, blankets and knot, as well as, the timing of when she bought sheets at a Bamberger's store and when she was physically separated from Kamienski during September 1983.

In Plaintiff reframes this allegation is his supplemental brief as:

> Attorneys Holzapfel, Kelaher, Lynch Ford and DeLigny and Investigator Churchill personally failed to supervise the investigation and prosecution and post-conviction litigation involving Kamienski.

(Pl. Sec. Supp. Br., ECF No. 186, ¶ 16). Plaintiff then alleges broad due process violations for failure to supervise. (*Id.* at ¶ 16b). Plaintiff's facts relevant to the claims above are summarized as follows:

<u>Defendant Holzapfel</u>

As Ocean County Prosecutor while his office investigated, indicted, and tried Kamienski, and opposed the trial judge's JNOV ruling. Defendant Holzapfel directly supervised the First Assistant County Prosecutor Terrence Farley and the Chief of Detectives, Defendant Churchill. (Pl. SOF, ECF No. 158, ¶ 42). Plaintiff states that during Holzapfel's tenure there was no person with oversight of the appeals unit or ethics issues. (*Id.* at ¶¶ 44-45). However, during Holzapfel's deposition, the following exchange occurred:

> Q. How about in the appeals area, was there one person who was in charge of it?

> A. I honestly don't remember.

(Dep. of Holzapfel, Ex. O, ECF No. 155-17, at T12:13-15). Holzapfel never learned that his office was investigating Kamienski for the DeTournay murders, never spoke to Defendants Churchill or Mahony about it, never communicated with Farley regarding the prosecution, never attended the

67

trial, and was not involved in any way. (*Id.* at ¶¶ 47-52). Holzapfel was not involved in the decision to appeal the trial judge's JNOV ruling. (*Id.*).

Defendants admit most of the facts above but deny that they are relevant to this action. (Def. SOF, ECF No. 166, ¶¶ 42, 44-45, 47-52).

Defendant Kelaher

Ocean County Prosecutor Kelaher held that during the time when Kamienski's habeas petition was pending, Defendant Kelaher directly supervised First Assistant County Prosecutor Terrence Farley. (Pl. SOF, ECF No. 158, ¶ 65). Defendant Marzarella was the head of the appeals unit under Kelaher, and there was no one with oversight of ethics issues. (*Id.* at ¶¶ 65, 67). Kelaher testified that he was unaware that Kamienski filed his habeas petition in June 2002, but learned that Kamienski had filed an appeal of its denial before leaving office. (*Id.* at ¶ 69). Plaintiff states that in May 2003, Kamienski's counsel alerted Kelaher on several occasions of possible issues with Kamienski's conviction, and Kelaher refused to permit the OCPO staff to further communicate with Kamienski's counsel. (*Id.* at ¶ 71).

However, in Kelaher's discovery responses, he states:

> I was the Ocean County Prosecutor from 2002 until June 2007. In May 2003 plaintiff's counsel Timothy Mcinnis contacted the Ocean County Prosecutor's Office and stated that he had been retained by plaintiff to represent him in the pending habeas corpus petition. As set forth in the attached letter dated October 23, 2003 from me to then Attorney General Peter C. Harvey, then Executive Assistant Prosecutor John J. Mercun allowed Mr. Mcinnis to view evidence in the criminal case. When it was determined that Mr. Mcinnis was not the attorney of record for Paul Kamienski, any further requests from Mr. Mcinnis were denied. As per the attached letter dated October 23, 2003, Mr. Mcinnis· was advised that any further dealings with him would be under the auspices of the court in official pleadings.

(Ex. C, P5, Kelaher Ans. to Interr, ¶ 4(h)(iii) (emphasis added)). Kelaher never investigated or asked anyone to investigate the issues raised by Kamienski's alleged counsel. (Pl. SOF, ECF No. 158, ¶ 74).

Defendants admit most of the facts above but deny that they are relevant to this action.

## Defendant Lynch Ford

As Ocean County Prosecutor while Kamienski's appeal was pending in the Third Circuit, Defendant Lynch Ford directly supervised First Assistant County Prosecutor Defendant DeLigny for most of her tenure. (*Id.* at ¶ 79). Defendant Marzarella was head of the appeals unit under Lynch Ford, and Defendant DeLigny was the ethics officer. (*Id.* at ¶¶ 81-82). Lynch Ford received two letters from Kamienski's counsel at the beginning of his habeas petition. (*Id.* at ¶ 77). One asked Lynch Ford to personally look into Kamienski's case and included Kamienski's opening brief, and the other asserted that the OCPO had submitted a false and misleading brief on Kamienski's direct appeal and included backup documentation. (*Id.*). Lynch Ford denies receiving these communications. (*Id.* at ¶ 78). Lynch Ford has no specific recollection of discussing Kamienski's appeal with Defendant Marzarella but recalls discussing the Third Circuit's decision and the OCPO's petition for certiorari. (*Id.* at ¶¶ 84, 86). She never discussed the Third Circuit litigation with Marzarella before he filed OCPO briefs. (*Id.* at ¶ 89). Lynch Ford had no formal system in place for being briefed by her staff about pending criminal appeals. (*Id.* at ¶ 85). Lynch Ford and Defendant DeLigny jointly decided not to act on Kamienski's request that the OCPO withdraw its appeal based on the claimed deficiencies. (*Id.* at ¶ 90).

Defendants admit most of the facts above, but deny that they are relevant to this action and deny that Defendants submitted a false brief. (Def. SOF, ECF No. 166, ¶ 77-79, 81-82, 84-86, 120).

Defendant DeLigny

Defendant DeLigny worked at the OCPO since 1987 and was the First Assistant County Prosecutor from 2007-2012 under Defendant Lynch Ford. (Pl. SOF, ECF No. 158, ¶ 116). He claims he was never the ethics officer, in contradiction to Defendant Lynch Ford's testimony. (*Id.* at ¶ 117). DeLigny testified that his first and only involvement with Kamienski's case was after the Third Circuit's reversal, when the office was considering filing a petition for certiorari with the U.S. Supreme Court. (*Id.* at ¶ 118). As First Assistant County Prosecutor, DeLigny spoke with Kamienski's counsel about the Third Circuit appeal and evidentiary deficiencies including the knot and rag testimony by Duckworth. (*Id.* at ¶ 119). After this call, Kamienski's counsel sent Defendant DeLigny two letters substantiating Kamienski's assertions that the OCPO had submitted a false and misleading brief on Kamienski's direct appeal and including additional exculpatory evidence. (*Id.* at ¶ 120). DeLigny denies receiving this documentation. (*Id.* at ¶ 124). Kamienski's counsel also sent DeLigny another letter requesting access, for supervised forensic tests, to the towel used to convict Kamienski. (*Id.* at ¶ 121). Defendant DeLigny did not respond to this request. (*Id.* at ¶ 121). After speaking to Kamienski's counsel, DeLigny spoke with Defendant Marzarella about the alleged evidentiary problems regarding Kamienski's conviction. (*Id.* at ¶ 122). DeLigny did not ask Marzarella if the accusations had merit, and he did not independently investigate, but he mentioned the call with Kamienski's counsel to Defendant Lynch Ford. (*Id.* at ¶ 123). DeLigny did not provide any supervisory oversight and was not involved with Kamienski's federal appeal in any way. (*Id.* at ¶ 129).

Defendants admit most of the facts above but deny that they are relevant to this action. (Def. SOF, ECF No. 166, ¶ 116-124, 126, 129).

Defendant Churchill

Defendant Churchill is a detective who held supervisory positions at the OCPO from 1981 to January 1995 and again from September 1997 to August 2007. (Pl. SOF, ECF No. 158, ¶ 237). He performed investigative supervisory functions on the Kamienski case from the time of the murders until Kamienski's habeas petition. (*Id.*). At his deposition, Churchill acknowledged that during the investigation of the DeTournay murders and drug transactions, he "basically [] was in charge of the investigators from the Prosecutor's office who worked on the case." (Dep. of Churchill, Ex. U, ECF 194-21, at T16:10-12; *see* Pl. SOF, ECF No. 158, ¶ 238). He performed supervisory duties during the investigation (1983), the grand jury indictment (1987), and the trial and post-trial motions (1988). (Pl. SOF, ECF No. 158, ¶ 237). He continued these supervisory duties throughout the appeals process between 1989 and 1992, during the filing of Kamienski's habeas petition between 2002 and 2006, and through the Third Circuit appeal in 2006. (*Id.*). Churchill also performed investigative functions for the OCPO from 1970 through 1995, and from 1997 to 2006. (*Id.* at ¶ 239). These duties continued throughout the Kamienski investigation. (*Id.* at ¶ 239-40). Churchill's investigative functions included interviewing witnesses, reviewing evidence, meeting daily with the team of agents conducting other aspects of the investigation, conducting a polygraph test, and choosing what evidence to run through forensic examination. (*Id.* at ¶ 240). Churchill discarded all the notes he possessed from the investigation. (*Id.* at ¶ 242). Plaintiff claims that Defendant Mahoney, under the supervision of Churchill and following the policies and practices of the OCPO, deliberately withheld interview notes showing that Kamienski had a legitimate reason for pulling his boat from the Barnegat Bay after the murders. (*Id.* at ¶¶ 252-54). Defendants deny this allegation, asserting that the reports based on these notes were

provided to Kamienski's defense, who never requested the interview notes. (Def. SOF, ECF No. 166 at ¶ 254).

Prosecutor Defendants -- Holzapfel, Kelaher, Lynch Ford and DeLigny

Even assuming for the sake of argument that the facts constitute violations of Kamienski's due process rights, Defendants Holzapfel, Kelaher, Lynch Ford, and DeLigny are entitled to absolute prosecutorial immunity. The Supreme Court has made clear that prosecutorial immunity extends to supervisory and administrative duties which "require legal knowledge and the exercise of related discretion, *e.g.* in determining what information should be included in training, supervision, or information-system management." *Van de Kamp*, 555 U.S. at 344. All the actions and non-actions alleged above are closely related to the judicial process because they involve the conduction of ongoing criminal trials and a related civil suit. *See id.* The fact that they were supervisory in nature is irrelevant. *Id.* at 344. Plaintiff attempts to create an "extreme indifference" exception to absolute immunity, but such an exception does not exist. (Pl. SOF, ECF No. 158 at 9). Absolute immunity exists to protect the independence of the prosecutor's office, and the Supreme Court has judged that it is better for some unscrupulous prosecutors to go unpunished than to subject honest prosecutors to the constant fear of retaliation from disgruntled defendants. *Van de Kamp*, 555 U.S. at 340, 345 (explaining that the purpose of prosecutorial immunity is to protect the proper functioning of the office rather than individual prosecutors).

Investigator Churchill

Plaintiff has also failed to make out a claim against Defendant Churchill. Supervisory officials "may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Instead, supervisory officials can only be held liable if they personally violate a constitutional right. *Id.* at 683. When

the violation consists of a failure to train or supervise employees, plaintiff must establish that the defendant was deliberately indifferent to plaintiff's constitutional rights. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d. Cir. 1999). A plaintiff can establish deliberate indifference by showing that 1) defendant knew his supervisees would confront a particular situation; 2) the situation involves a difficult choice or a history of improper behavior; and 3) a supervisee's wrong choice will often lead to a deprivation of constitutional rights. *Carter*, 181 F.3d at 357.

A supervisor loses the protection of qualified immunity only if the supervisor's failure to train or supervise causes the violation of a constitutional right which was clearly established at the time of the alleged violation. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). As explained above, a "clearly established" right is one which is beyond debate and obvious to any reasonable official- - defined by applicable Supreme Court precedent, controlling authority in the jurisdiction, or a robust consensus in the Courts of Appeals. *Mullenix*, 136 S. Ct. at 308; *Ashcroft*, 131 S.Ct. at 2083-84; *Barna v. Bd. of Sch. Dirs. of the Panther Valley Sch. Dist.*, 877 F.3d 136, 142 (3d Cir. 2017).

Although part one of the deliberate indifference test may be satisfied here (an investigator likely knows that his underlings will confront the choice of which evidence to preserve and present to the other side), there is little to no evidence of part two or part three. *Carter*, 181 F.3d at 357. With regard to element two, Plaintiff has not detailed any history of similar bad behavior which would have placed Churchill on notice that his investigators required more supervision. Additionally, on element three, at the time of the investigation (1983 to 1988) and trial (1988), the destruction of investigatory notes was no clearly established (and there was no obligation to train the officers differently). *See*, _generally_, *Kisela*, 138 S. Ct. at 1152 (quoting *White*, 137 S. Ct. at 551).

**CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No. 155) is granted. Plaintiff's Motion to Supplement the Record (ECF No. 224) is denied as moot.

**ORDER**

This matter having come before the Court on Defendants Marlene Lynch Ford, Thomas F. Kelaher, James W. Holzapfel, Ronald F. DeLigny, John Mercun, Samuel J. Marzarella, E. David Millard, James A. Churchill, and Daniel T. Mahony's ("Defendants") Motion for Summary Judgment, (ECF No. 155), and Plaintiff's motion to supplement the record (ECF No. 224) and the Court having carefully reviewed and taken into consideration the submissions of the parties, as well as the arguments and exhibits therein presented,

IT IS on this 17th day of September, 2019,

ORDERED that Defendants' Motion for Summary Judgment (ECF No. 155) is granted; and it is further

ORDERED that Plaintiff's Motion to Supplement the Record (ECF No. 224) is denied as moot.

_____
PETER G. SHERIDAN, U.S.D.J.